EXHIBIT A

Skip To MainContent

[Search]



⚠ **WARNING:** Bogus Phone Calls, Emails May Lead to Fraud.   **Read More...**

Civil Court Case Information - Case History

### Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2017-014735 | Judge: | Sanders, Teresa |
| File Date: | 12/20/2017 | Location: | Downtown |
| Case Type: | Civil | | |

### Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Dawn J McGinnis | Plaintiff | Female | Charles Surrano |
| Paul Revere Life Insurance Company, The | Defendant | | Pro Per |
| Unum Group Corporation | Defendant | | Pro Per |

### Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 12/27/2017 | AFS - Affidavit Of Service | 12/29/2017 | |
| **NOTE:** THE PAUL REVERE LIFE INSURANCE COMPANY | | | |
| 12/26/2017 | AFS - Affidavit Of Service | 12/27/2017 | |
| **NOTE:** PAUL REVERE LIFE INSURANCE COMPANY | | | |
| 12/26/2017 | AFS - Affidavit Of Service | 12/28/2017 | |
| **NOTE:** UNUM GROUP CORPORATION | | | |
| 12/26/2017 | SUM - Summons | 12/27/2017 | |
| 12/26/2017 | SUM - Summons | 12/27/2017 | |
| 12/20/2017 | COM - Complaint | 12/22/2017 | |
| 12/20/2017 | CCN - Cert Arbitration - Not Subject | 12/22/2017 | |
| 12/20/2017 | CSH - Coversheet | 12/22/2017 | |
| 12/20/2017 | NJT - Not Demand For Jury Trials | 12/22/2017 | |

### Case Calendar

**There are no calendar events on file**

### Judgments

**There are no judgments on file**

**In the Superior Court of the State of Arizona**
**In and For the County of** Maricopa

# CV2017-014735

(Please Type or Print)

MICHAEL K. JEANES, CLERK
DEP
BY *Elisha Flores*
E. FLORES, FILED

17 DEC 20 PM 4: 54

Is Interpreter Needed?  ☐ Yes  ☒ No
If yes, what language:

Plaintiff's Attorney  Charles J. Surrano, III

Attorney Bar Number  07732

| | | | |
|---|---|---|---|
| Plaintiff's Name(s): (List all) | Plaintiff's Address: | Phone #: | Email Address: |

Dawn J. McGinnis, M.D., c/o Surrano Law Offices, 7114 E. Stetson Drive, Suite 300, Scottsdale, AZ 85251

(602) 264-1077, cjs@surranolawfirm.com

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)  The Paul Revere Life Insurance Company, Unum Group Corporation

(List additional defendants on page two and/or attach a separate sheet)

EMERGENCY ORDER SOUGHT:  ☐ Temporary Restraining Order  ☐ Provisional Remedy  ☐ OSC

☐ Election Challenge  ☐ Employer Sanction  ☐ Other _____
(Specify)

☐ RULE 8(h) COMPLEX LITIGATION APPLIES. Rule 8(h) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.

(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category.)

☐ THIS CASE IS ELIGIBLE FOR THE COMMERCIAL COURT UNDER EXPERIMENTAL RULE 8.1. (Maricopa County only.) Rule 8.1 defines a commercial case and establishes eligibility criteria for the commercial court. Generally, a commercial case primarily involves issues arising from a business contract or business transaction. However, consumer transactions are not eligible. A consumer transaction is one that is primarily for personal, family or household purposes. **Please review Rule 8.1 for a complete list of the criteria.** See http://www.superiorcourt.maricopa.gov/commercial-court/. You must check this box if this is an eligible commercial case. **In addition, mark the appropriate box below in the "Nature of Action" case category.** The words "commercial court assignment requested" must appear in the caption of the original complaint.

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**

☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort

☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**

☐ 121 Physician M.D.      ☐ 123 Hospital
☐ 122 Physician D.O       ☐ 124 Other

Case No._____

**130 CONTRACTS:**

- ☐ 131 Account (Open or Stated)
- ☐ 132 Promissory Note
- ☐ 133 Foreclosure
- ☐ 138 Buyer-Plaintiff
- ☐ 139 Fraud
- ☒ 134 Other Contract (i.e. Breach of Contract)
- ☐ 135 Excess Proceeds-Sale
- ☐ Construction Defects (Residential/Commercial)
  - ☐ 136 Six to Nineteen Structures
  - ☐ 137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

- ☐ 156 Eminent Domain/Condemnation
- ☐ 151 Eviction Actions (Forcible and Special Detainers)
- ☐ 152 Change of Name
- ☐ 153 Transcript of Judgment
- ☐ 154 Foreign Judgment
- ☐ 158 Quiet Title
- ☐ 160 Forfeiture
- ☐ 175 Election Challenge
- ☐ 179 NCC-Employer Sanction Action
  (A.R.S. §23-212)
- ☐ 180 Injunction against Workplace Harassment
- ☐ 181 Injunction against Harassment
- ☐ 182 Civil Penalty
- ☐ 186 Water Rights (Not General Stream Adjudication)
- ☐ 187 Real Property
- ☐ Special Action against Lower Courts
  (See lower court appeal cover sheet in Maricopa)

- ☐ 194 Immigration Enforcement Challenge
  (§§1-501, 1-502, 11-1051)

**150-199 UNCLASSIFIED CIVIL:**

- ☐ Administrative Review
  (See lower court appeal cover sheet in Maricopa)
- ☐ 150 Tax Appeal
  (All other tax matters must be filed in the AZ Tax Court)
- ☐ 155 Declaratory Judgment
- ☐ 157 Habeas Corpus
- ☐ 184 Landlord Tenant Dispute- Other
- ☐ 190 Declaration of Factual Innocence
  (A.R.S. §12-771)
- ☐ 191 Declaration of Factual Improper Party Status
- ☐ 193 Vulnerable Adult (A.R.S. §46-451)
- ☐ 165 Tribal Judgment
- ☐ 167 Structured Settlement (A.R.S. §12-2901)
- ☐ 169 Attorney Conservatorships (State Bar)
- ☐ 170 Unauthorized Practice of Law (State Bar)
- ☐ 171 Out-of-State Deposition for Foreign Jurisdiction
- ☐ 172 Secure Attendance of Prisoner
- ☐ 173 Assurance of Discontinuance
- ☐ 174 In-State Deposition for Foreign Jurisdiction
- ☐ 176 Eminent Domain– Light Rail Only
- ☐ 177 Interpleader– Automobile Only
- ☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- ☐ 183 Employment Dispute- Discrimination
- ☐ 185 Employment Dispute-Other
- ☐ 195(a) Amendment of Marriage License
- ☐ 195(b) Amendment of Birth Certificate
- ☐ 163 Other _____
  (Specify)

**COMPLEXITY OF THE CASE**

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

- ☐ Antitrust/Trade Regulation
- ☐ Construction Defect with many parties or structures
- ☐ Mass Tort
- ☐ Securities Litigation with many parties
- ☐ Environmental Toxic Tort with many parties
- ☐ Class Action Claims
- ☐ Insurance Coverage Claims arising from the above-listed case types
- ☐ A Complex Case as defined by Rule 8(h) ARCP

**Additional Plaintiff(s)**

_____

_____

**Additional Defendant(s)**

_____

_____

©Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV10f - 120116

1

**SURRANO LAW OFFICES**
Attorneys at Law

2

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone: (602) 264-1077
Fax: (602) 264-2213

3

4

COPY

DEC 2 0 2017

MICHAEL K. JEANES, CLERK
E. FLORES
DEPUTY CLERK

5

Charles J. Surrano III (007732) cjs@surranolawfirm.com
John N. Wilborn (013714) jnw@surranolawfirm.com
AZTurboCourt e-service distribution: surranolaw@gmail.com
Attorneys for Plaintiff

6

7

8

**CAMPBELL, YOST, CLARE & NORELL, P.C.**
3101 N. Central Ave., Suite 1200
Phoenix, AZ 85012
Phone: (602) 322-1600
Fax: (602) 322-1604

9

10

11

Stephen C. Yost (State Bar No. 011149) syost@cycn-phx.com
Co-Counsel for Plaintiff

12

13

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

14

**IN AND FOR THE COUNTY OF MARICOPA**

15

16

Dawn J. McGinnis, M.D., an Arizona
resident,

17

Plaintiff,

18

19

vs.

20

The Paul Revere Life Insurance Company,
a foreign insurer, and Unum Group
Corporation, a foreign corporation,

21

22

23

Defendants.

Case No.: CV2017-014735

**COMPLAINT FOR TORT
(BAD FAITH) AND FOR
BREACH OF CONTRACT**

24

As and for her Complaint against these Defendants, Plaintiff sets forth and

25

alleges as follows:

26

.. ..

1

## ALLEGATIONS COMMON TO ALL COUNTS

1. That at all times mentioned herein, Plaintiff was and still remains a resident of Maricopa County, Arizona.

2. That at all times mentioned herein, the Defendant, The Paul Revere Life Insurance Company, (hereafter "Paul Revere") was and still remains a life and disability insurer licensed to transact and transacting insurance in the State of Arizona and elsewhere.

3. That, among other things, the Defendant, Paul Revere, marketed, sold and issued disability income insurance policies.

4. That Plaintiff purchased a certain disability income insurance policy from the Defendant, Paul Revere, which is more particularly identified by policy number 0102670589, issued on July 1, 1994.

5. That the Defendant, Unum Group Corporation (hereafter "Unum"), is a foreign corporation with its principal place of business in Chattanooga, Tennessee.

6. That the Defendant Paul Revere, became a wholly owned subsidiary of Unum after the purchase of Plaintiff's policy.

7. That the Defendant, Unum, was at all relevant times herein, engaged in the business of evaluating, administering, investigating and overseeing the individual disability income claims arising under the Defendant, Paul Revere's disability policies, including Plaintiff's claims as identified herein.

8. That Unum's employees were at all times relevant to this action the actual or ostensible agents of the Defendant Paul Revere, providing services for the administration of Paul Revere's claims and the servicing of its policies.

9. That Unum's employees acted for and on behalf of Defendant Paul Revere as lent employees and/or served both Defendants as employees and/or agents.

2

10. That the Defendants, at all times relevant herein, acted in concert as joint venturers.

11. That these Defendants caused acts to occur in Arizona out of which this action arises.

12. That as joint venturers, each is the agent of the other.

13. That these Defendants are jointly and severally liable for the damages caused by either or both of them as hereinafter alleged.

14. That the aforesaid policy provided, in relevant part, for total disability benefits to be paid if "because of injury or sickness" the Plaintiff became "unable to perform the important duties of [her] occupation".

15. That the policy further defined [your] occupation to mean "the occupation or occupations on which you are regularly engaged at the time disability begins".

16. That Plaintiff's "maximum benefit period" under the policy is for her natural lifetime.

17. That the base total disability benefit is $7,650 per month.

18. That beginning in or about the year 2000, the Plaintiff developed symptoms of low back pain for which she commenced medical treatment.

19. That at that time, and at all times hereinafter mentioned, the Plaintiff's occupation was that of a clinical anesthesiologist.

20. That despite the painful condition of Plaintiff's back, she continued to work in her regular occupation of anesthesiology.

21. That, however, by May of 2010, Plaintiff's lumbar pain and radicular symptoms to her legs had become severe and disabling.

22. That Plaintiff was, by reason of sickness, unable to work regularly at her occupation as an anesthesiologist.

23. That by June 15 ,2010, Plaintiff filed a claim with the Defendant Paul Revere for own occupation disability benefits.

24. That Plaintiff's disability was supported, in part, by the opinion of her attending physician, a board certified orthopedic surgeon.

25. That following submission of her claim, the Defendant Paul Revere performed its own investigation into Plaintiff's claim.

26. That Defendant Paul Revere determined Plaintiff was "disabled as defined in her policy".

27. That Plaintiff remained out of work for approximately 10 months because of her disabling condition.

28. That during this time, Plaintiff continued to work on and treat her disabling condition.

29. That Plaintiff eventually gained enough improvement to gradually resume her occupational duties as an anesthesiologist.

30. That by April 2011, Plaintiff voluntarily withdrew her claim for disability benefits.

31. That notwithstanding the foregoing, Plaintiff's back and neurological problems had not been cured, but only controlled.

32. That thereafter, Plaintiff continued to work in her regular occupation as an anesthesiologist, albeit with symptomatic back and leg pain.

33. That by June of 2015, Plaintiff underwent a severe and debilitating episode of low back pain which would remain largely unremitting.

34. That Plaintiff's condition included severe low back pain, radiation of pain over her buttocks into her legs and feet with some numbness in her feet.

35. That Plaintiff was diagnosed with lumbar spinal stenosis with an annular tear at L4-5.

36.    That Plaintiff's diseased back prevented her from performing duties of her occupation, which had remained that of a clinical anesthesiologist.

37.    That Plaintiff's attending physician advised her to stop working and, in fact, Plaintiff had done so by June 15, 2015.

38.    That Plaintiff submitted a second claim for disability benefits on or about July 10, 2015.

39.    That Plaintiff's second claim included, and was supported by, a certification by her attending physician of her disabling restrictions and limitations.

40.    That at the time of her second claim, and as part of it, Plaintiff provided the Defendant with a comprehensive and detailed description of her job duties, the evolution and progression of her symptoms and diagnoses and information about the conditions causing her disability.

41.    That in further support of her claim for benefits, Plaintiff also provided the Defendants with an accurate and complete list of her medical providers relative to her lumbar diagnosis and treatment.

42.    That a true copy of the documents referred to in paragraphs 38 to 40 is attached to this Complaint as Exhibit "A".

43.    That by November 4, 2015, the Defendant, Paul Revere, by its director of disability claims, Timothy P. Loftus, had made an Initial Liability ("IL") approval and authorized payment of disability benefits to Plaintiff under a reservation of rights.

44.    That notwithstanding the foregoing, the Defendant Paul Revere denied Plaintiff's claim for benefits effective March 10, 2016.

## COUNT ONE: BREACH OF CONTRACT

45.    That Plaintiff repeats, reasserts and realleges all the allegations contained herein above as if more fully set forth and incorporated herein.

5

1   46.   That the aforesaid policy constitutes a lawful and enforceable contract.

2   47.   That Plaintiff paid her premiums thereunder consistently and when due.

3   48.   That Plaintiff was totally disabled from her regular occupation as defined under

4         the policy on and before March 10, 2016.

5   49.   That the Defendant Paul Revere was legally obligated to pay the Plaintiff total

6         disability benefits after her elimination period of 90 days.

7   50.   That the Defendant Paul Revere's failure and refusal to pay Plaintiff her full and

8         owing disability benefits through its denial and repudiation on March 10, 2016 is

9         a breach of the contract.

10  51.   That Plaintiff has sustained actual damages as a result of the breach.

11  52.   That Plaintiff has incurred and continues to incur attorneys' fees that are

12        recoverable under A.R.S. § 12-341.01.

13  **COUNT TWO: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR**

14  **DEALING ( aka "BAD FAITH")**

15  53.   That Plaintiff repeats, reasserts and realleges all the allegations contained herein

16        above as if more fully set forth and incorporated herein.

17  54.   That the Defendants at all times owed and still owe the Plaintiff an implied duty

18        of good faith and fair dealing.

19  55.   That the denial of Plaintiff's benefits on March 10, 2016 was unreasonable and in

20        disregard the duty of good faith and equal consideration owed to Plaintiff.

21  56.   That the Defendants knew or reasonably should have known their decision to

22        deny benefits was unreasonable.

23  57.   That the Defendants breached the duty of good faith and fair dealing and thereby

24        acted in "bad faith" in the processing and denial of Plaintiff's claim.

25  58.   That, among other things, the Defendants engaged in the following unreasonable

26        claims practices in the investigation and denial of Plaintiff's claim:

6

a.  Purposely ignoring the job duties regularly required of Plaintiff as a practicing anesthesiologist;

b.  Mischaracterizing Plaintiff's occupational duties;

c.  Selectively retrieving and reviewing Plaintiff's medical records;

d.  Selectively providing Plaintiff's medical records to Defendants in-house medical consultants;

e.  Questioning the absence of medical information known to exist, but which Defendants chose not to obtain;

f.  Failing to consider Plaintiff's known and disabling condition in 2010 based on similar causes;

g.  Ignoring and mischaracterizing the opinions of Plaintiff's primary attending physician, a certified specialist in spinal surgery;

h.  Deliberately concealing medical aspects of Plaintiff's condition from in-house medical consultants so as to bias their finding against disability;

i.  Interpreting the absence of powerful, narcotic pain medications in Plaintiff's pharmacology as evidence of non-disabling pain, rather than considering the adverse and dangerous effects of practicing anesthesiology under the influence of such medications;

j.  Upon information and belief, and as more fully set forth hereafter, targeting Plaintiff's claim to meet "recovery" goals, i.e., reducing reserve liabilities; and

k.  Upon further information and belief, using the "recovery" recognized in the denial of Plaintiff's claim, in part, to obtain higher performance bonuses for persons involved in overseeing and administering it.

59.    That by August 25, 2016, Plaintiff, through counsel retained by her, objected to and appealed from the denial of her disability benefits.

60.    That the objection and appeal provided Defendants with documents and records which were omitted from consideration by Unum before denial of the claim and submitted new and additional information including:

        a.   A comprehensive letter from Plaintiff's treating physician detailing the nature of Plaintiff's condition and why it limits her from performing the duties of her occupation;

        b.   A report from an independent medical examination corroborating L4-5 discogenic pain with spinal stenosis, making her "unable to perform her essential job functions as an anesthesiologist";

        c.   A report from an independent anesthesiologist outlining and corroborating the duties of an anesthesiologist, such as Plaintiff.

61.    That the Defendant did not deny that it had closed Plaintiff's claim with the deficiencies and omissions noted above.

62.    That rather than accept Plaintiff's claim and pay her benefits, in light of the Defendants' inadequate claims investigation, it relied on the same and now other medical in-house consultants to refute the new and additional evidence submitted and to gird its earlier denial.

63.    That on March 7, 2017, the Defendant Unum upheld its earlier claim denial after a pretextual reevaluation of Plaintiff's claim.

64.    That Defendants were aware that their conduct in Plaintiff's claim was unfair and unreasonable because this same conduct has been sanctioned in the past. Prior to Plaintiff's claim arising, Defendants were put on notice by a national association of state insurance commissioners investigating Defendants' practices that the following claims handling practices are improper:

8

a. Rejecting a claimant's treating doctor's opinion without evidence that the doctor's opinion was not well supported by medically acceptable clinical or diagnostic standards, and was inconsistent with other substantial evidence in the record;

b. Failing to secure an IME when there is a disagreement between Defendants and the treating doctor;

c. Requiring redundant or unnecessary requests for information not reasonably required for adequate analysis of the claim;

d. Contiuing to seek additional information where claimants have provided adequate proof of disability;

e. Failing to consider all diagnoses and impairments and their effect on the whole person;

f. Interpreting or applying information from the treating doctor in an unfair manner;

g. Characterizing certain disabling conditions as self-reported, e.g., pain and weakness, and requiring objective evidence to support disability, even though not required by the policy; and

h. Mischaracterizing the claimant's occupation and/or his duties in determining whether the claimant is disabled.

65. That the steadfast denials of Plaintiff's claim were result driven and the consequence of a corporate program to enhance claim "recoveries", i.e., reserve reductions.

66. That, upon information and belief, during and about the administration of Plaintiff's claim, the Defendant Unum had in place plans to achieve certain "performance metrics".

67.  That, upon information and belief, upper level claim management, including the Director of Individual Disability Claims, Timothy P. Loftus, who was directly involved in the administration of Plaintiff's claim, were paid performance bonuses based, in part, on the level of claim "recoveries" they could secure for the company.

68.  That the higher the amount of the reserve, the greater the recovery would be if and when that claim was closed.

69.  That, upon information and belief, the amount of reserves on individual claims could and would be adjusted depending on the payment status of the claim.

70.  That, upon information and belief, claims in which payments had been made would have higher reserve values, including claims where payments were made under a "reservation of rights" or "on an exceptional basis to be of service to the claimant".

71.  That upon information and belief, such higher value paid or temporarily paid claims were considered "paid recoveries" subject to "paid recovery" objectives and performance metrics.

72.  That the Plaintiff's claim, after open less than four months, was paid under a "reservation of rights" and "on an exceptional basis to be of service" to her.

73.  That the payment of temporary benefits was directly authorized by the then Director of the Individual Disability Claim Department, Timothy P. Loftus.

74.  That, upon information and belief, and consistent with the foregoing, this increased the value of Plaintiff's claim to the Defendants through the claim's closure.

75.  That, upon information and belief, closing Plaintiff's claim without a permanent finding of disability would have resulted in a higher "paid recovery" for the Defendants.

76. That, upon information and belief, the Plaintiff's claim was manipulated by Loftus and others as part of a corporate plan or scheme to meet desired "performance metrics" and thereby obtain additional compensation.

77. That, in fact, Unum investigated Loftus on suspicion of his manipulation of "performance metrics". (See Exhibit "B", hereto, Unum's Complaint against Loftus, and Exhibit "E" thereto, "UpJohn Warning").

78. That the aforesaid plan imposed arbitrary goals for claim closures, i.e., "recoveries", and resulted in unreasonable claim practices, such as in Plaintiff's case to achieve these goals.

79. That as a result of these arbitrary goals and metrics, the Defendants engaged in a pattern and practice of unreasonable claim practices and closures.

80. That, moreover, Defendants created and maintained financial incentives for claim personnel to meet or exceed "recovery" metrics by claim closures, creating an inherent conflict between the personal interests of claim personnel and fair and unbiased claim handling for the benefit of the insureds.

81. That these Defendants have acted in such a way as to serve their own interests, knowing or having reason to know that their conduct might significantly injure the rights of others and/or have consciously pursued a course of conduct knowing that it created a substantial risk of harm to others.

82. That by reason of the foregoing, the Defendants have breached the duty of good faith and fair dealing.

83. That by further reason of the foregoing, these Defendants are jointly and severally liable to Plaintiff for the actual and general damages sustained by her.

.. ..

.. ..

.. ..

11

WHEREFORE, the Plaintiff requests judgment against these Defendants, jointly and severally, as follows:

## COUNT ONE:  BREACH OF CONTRACT

A.    For a finding that the Plaintiff is entitled to coverage;

B.    For judgment in favor of the Plaintiff and against the Defendants;

C.    For an award of Plaintiff's actual damages;

D.    For an award of Plaintiff's reasonable attorneys' fees and taxable costs incurred; and

E.    Such other and further relief as this Court deems just and proper under the circumstances.

## COUNT TWO: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING ("BAD FAITH")

A.    For an award in favor of the Plaintiff and against these Defendants;

B.    For an award of Plaintiff's actual damages;

C.    For an award of Plaintiff's general and consequential damages;

D.    For an award of punitive damages;

E.    For any and all prejudgment and post judgment interest awardable to the Plaintiff;

F.    For an award of Plaintiff's reasonable attorney's fees and taxable costs pursuant to ARS §12-341.01; and

G.    Such other and further relief as this Court deems just and proper under the circumstances.

///

///

///

12

1    DATED this _____ day of December, 2017.

2                                    SURRANO LAW OFFICES

3

4                                    By: _____

5                                        Charles J. Surrano, III
                                         John N. Wilborn
6                                        Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

13

# EXHIBIT A

```
                              Activity
-----------------------------------------------------------------------
Checked/Unchecked Indicator: No
Type: Personal         Name: General
Status: Completed
Original Notify Date: 07/07/2015
Notify Date: 07/07/2015
Due Date:
Subject: Flup On UW
Upon Completion Notify Linked Claim Owner(s): No
Mark As Priority: No
Activity Owner: Edmonds, Pam
Action:

Request Fields
-----------------------------------------------------------------------
Request: Edmonds, Pam 06/27/2015 17:02:24: verify uw rec'd

Created By: Edmonds, Pam
Created Date: 06/27/2015 17:02:24       Create Site: Portland

Response Fields
-----------------------------------------------------------------------
Response: Edmonds, Pam 07/07/2015 11:58:47: uw file rec'd 06.29.15



Completed By: Edmonds, Pam
Completed Date: 07/07/2015 11:58:47      Complete Site: Portland
```

*Claimant Name: Dawn J McGinnis      Claim #:  11107633*

```
                              Document Detail
--------------------------------------------------------------------------------
Checked/Unchecked Indicator: No

Document ID: 2015071316090079F523

Entry Date: 07/13/2015 16:09:05

Received Date: 07/13/2015

Date Added to Claim: 07/13/2015

Primary Doc Type: Claim Form

Secondary Doc Type: Employee Statement

Medical Provider:

Document Notes: EE, OCC, TPAU, AU

Work Notes:
```

*Claimant Name: Dawn J McGinnis      Claim #:  11107633*



**INDIVIDUAL DISABILITY CLAIM FORM**

The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262

Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

For use with policies issued by the following Unum Group ["Unum"] subsidiaries:

Unum Life Insurance Company of America   Provident Life and Accident Insurance Company
The Paul Revere Life Insurance Company

---

**OUR COMMITMENT TO YOU**

We understand that a disabling illness or injury may create emotional, physical and financial challenges and we
want to do whatever we can to help you. You have our commitment to provide you with responsive service and to
be understanding and sensitive to your circumstances during the claim process.

---

## INSTRUCTIONS

**When should you use this claim form?**

Use this claim form to submit an Individual Disability claim to Unum.

---

**Who is responsible for completing this claim form?**

The information provided on this claim form will be used to evaluate your eligibility for disability benefits. Please
provide complete and legible responses to ensure your claim is processed as quickly as possible. Please enclose any
additional information you feel will assist us in the evaluation of your claim. During the evaluation of your claim, we
may need to request additional information.

- **Individual Statement (pages 4-7):** Please complete this section of the claim form and fax it to 1-866-562-4794. If
  you prefer, it may be mailed to the address noted above.

- Please complete the name and date of birth fields at the top of every page for easy identification purposes in case
  the pages become separated.

- **Occupation Description Statement (pages 8-10):** Please complete this section of the claim form and fax it to
  1-866-562-4794. If you prefer, it may be mailed to the address noted above.

- **Authorization to Disclose Information to Third Parties (page 11):** If you wish to give us permission to share the
  details of your claim with a third party (such as your spouse, son, daughter, friend, etc.), please sign and date this
  form and fax it to 1-866-562-4794. If you prefer, it may be mailed to the address noted above.

- **Individual Authorization (last page):** Please sign and date this form and provide a copy to your attending
  physician. Fax the completed form to 1-866-562-4794 or mail it to the address noted above.

- **Attending Physician Statement (pages 12-14):** Please complete Part I of this statement, then give this section of
  the claim form to the physician or treating provider primarily responsible for your care. Ask him/her to complete Part
  II and fax the completed form to 1-866-562-4794. If s/he prefers, it may be mailed to the address noted above.

---

## Questions?

If, at any time, you have questions about the claim process or need help to complete this form, please call the above
toll-free number. Our Contact Center is staffed with experienced professionals who can be contacted from 8 a.m. to 8
p.m. Monday through Friday.

---

*Claimant Name: Dawn J McGinnis        Claim #:   11107633*

 **INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-366-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

---

| **Instructions (continued) / Claim Fraud Statements** |
|---|

### Fraud Warning

For your protection, the laws of several states, including Alaska, Arizona, Arkansas, Delaware, Idaho, Indiana, Louisiana, Maine, Maryland, New Mexico, Ohio, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and West Virginia require the following statement to appear on this claim form:

Any person who knowingly and with the intent to injure, defraud or deceive an insurance company presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

#### Fraud Warning for Alabama Residents
For your protection, Alabama law requires the following to appear on this claim form:
Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

#### Fraud Warning for California Residents
For your protection, California law requires the following to appear on this claim form:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

#### Fraud Warning for Colorado Residents
For your protection, Colorado law requires the following to appear on this claim form:
It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

#### Fraud Warning for District of Columbia Residents
For your protection, the District of Columbia requires the following to appear on this claim form:
WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

#### Fraud Warning for Florida Residents
For your protection, Florida law requires the following to appear on this claim form:
Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing false, incomplete or misleading information is guilty of a felony of the third degree.

#### Fraud Warning for Kentucky Residents
For your protection, Kentucky law requires the following to appear on this claim form:
Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

#### Fraud Warning for Minnesota Residents
For your protection, Minnesota law requires the following to appear on this claim form:
A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

#### Fraud Warning for New Hampshire Residents
For your protection, New Hampshire law requires the following to appear on this claim form:
Any person who, with a purpose to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638.20.

---

CL-1020 (06/13)                                          2

---

*Claimant Name: Dawn J McGinnis      Claim #:  11107633*

 **INDIVIDUAL DISABILITY CLAIM FORM**
. The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

---

**Instructions (continued) / Claim Fraud Statements**

---

### Fraud Warning for New Jersey Residents
For your protection, New Jersey law requires the following to appear on this claim form:
Any person who knowingly and with intent to defraud any insurance company or other persons, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and civil penalties.

## Fraud Warning for New York Residents
For your protection, New York law requires the following to appear on this claim form:
Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

### Fraud Warning for Pennsylvania Residents
For your protection, Pennsylvania law requires the following to appear on this claim form:
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

### Fraud Warning for Puerto Rico Residents
For your protection, Puerto Rico law requires the following to appear on this claim form:
Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. If aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years; if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

---

CL-1020 (06/13)                                3

---

*Claimant Name:  Dawn J McGinnis        Claim #:   11107633*

 **unum**®

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959  Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

## INDIVIDUAL STATEMENT (PLEASE PRINT)

### A. Information About You

Last Name: M C G I N N I S    Suffix:    First Name: D A W N    MI: J

Date of Birth (mm/dd/yy): 6 5    Social Security Number: 2 6 7 5    Gender: ☐ Male  ☒ Female    Policy Number: 0 1 0 2 6 7 0 5 8 9 C

Home Address:

City: P H O E N I X    State: A Z    Zip: 8 5 0 1 6 -

Home Telephone Number: 1 2 6 2    Cellular Telephone Number: 9 6 2 7    Preferred e-mail address for communication purpose only:

The state in which you work: A Z

Employer Name: *Self employed but worked as a 'group' under this name)* P a r k   C e n t r a l   A n e s t h e s i o l o g i s t s

Employer Address: *Billing office* 3 0 0   W   C l a r e d o n   A v e   1 4 6    Employer Telephone Number: 6 0 2 2 3 9 1 8 0 3

Language Preference: ☒ English  ☐ Spanish

Please check all types of coverage you have with Unum.

☐ Short Term Disability  Policy #: _____  ☒ Long Term Disability  Policy #: 01-0267058 9-C  ☐ Life Insurance  Policy #: _____

### B. Information About Your Disability Date

| Date you are claiming your disability began (mm/dd/yy): | Date last worked (mm/dd/yy): | Number of hours worked on date last worked: |
|---|---|---|
| 06/16/15 | 06/15/15 | 10 hours |

### C. Information About the Condition(s) Causing Your Disability

1. For sickness, answer the following questions then go to #4:  *(see "Information about the condition causing my disability" Addendum)*

What is the name of your medical condition? Spinal Stenosis    What were your first symptoms? back pain (Lumbar area)

| When did you first notice the symptoms? | Date your illness began (mm/dd/yy): | Date you were first treated (mm/dd/yy): |
|---|---|---|
| 04/10/2000 | 04/10/2000 | 04/10/2000 |

2. For an injury/accident, answer the following questions then go to #4:

What is the name of your medical condition? N/A    Date the injury/accident occurred (mm/dd/yy):

Where and how did the injury/accident occur?

| What are the symptoms related to your injury/accident? | When did you first notice the symptoms? |
|---|---|
| Date you were first treated (mm/dd/yy): | If related to a motor vehicle accident, was an accident report filed? ☐ Yes  ☐ No   If yes, in what state was the report filed? |

CL-1020 (06/13)    4

Claimant Name:  Dawn J McGinnis    Claim #:  11107633



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

---

**INDIVIDUAL STATEMENT (Continued)** Please print your name and date of birth below for identification purposes

Individual's Name (Last Name, Suffix, First Name, MI)

| M | C | G | I | N | N | I | S |   | D | A | W | N |   | J |   |   |   |   |   |   |   |

Date of Birth (mm/dd/yy)  6 5

**3. For pregnancy, answer the following questions then go to Section D:**

What is your expected delivery date? (mm/dd/yy)  N/A

Were there any complications causing you to stop work prior to your expected delivery date?  ☐ Yes  ☐ No   If yes, please explain:

Have you already delivered?  ☐ Yes  ☐ No   If yes, what type of delivery?  ☐ Vaginal  ☐ C-Section   If yes, date of delivery (mm/dd/yy):

**4. For all medical conditions except pregnancy, answer the following questions:**

Is your condition related to your occupation?  ☒ Yes  ☐ No   If yes, please explain how:
It is exacerbated by my occupation   Please see "Evolution and Progression of my Symptoms of Spinal Stenosis" addendum

Have you filed a Workers' Compensation claim?  ☐ Yes  ☒ No   If no, do you intend to file a Workers' Compensation Claim?  ☐ Yes  ☒ No

Name of Workers' Compensation Carrier:  N/A     Telephone Number:

**D. Information About Your Day-to-Day Activities**

Please describe your current activities (for example, household chores, reading, computer use, driving, caring for family members/children, etc.):
Simple household chores, making meals for myself, simple clean up, reading, computer use when necessary, driving, walking the dog, shopping for necessities.

Please describe your current activities before your disability began:   (exacerbation)
Same as above but when I am in severe pain or muscle spasm I cannot do most of the above — for days to sometimes weeks.

Does your current condition prevent you from caring for yourself?  ☒ Yes  ☐ No   When my symptoms are exacerbated I can barely
Does someone provide you with assistance in your daily activities?  ☒ Yes  ☐ No   take care of myself until I recuperate (days to
Do you use an assistive device(s) such as a cane, walker, hearing aid, etc.?  ☒ Yes  ☐ No  (sometimes a lumbar support)  months)
If you answered yes to any of these questions, please provide details: Friends have come over to help with my dog, getting me to bathroom, picked up prescriptions, delivered water, made meals, otherwise nothing gets done until my symptoms improve.

**E. Information About Your Return to Work**

Have you returned to work?  ☐ Yes  ☒ No
If yes, in your previous occupation?  ☐ Yes  ☐ No
If no, when do you expect to return? (mm/dd/yy) I am not returning

If yes, please indicate the date.
Part-Time (mm/dd/yy): N/A   Full-Time (mm/dd/yy): N/A   Hours Per Week:
What is your monthly income before taxes? $ 25,437

What duties of your occupation are you able to perform, and how long are you able to perform them?
I am able to perform duties of my profession when not in an exacerbation of my symptoms. However, the duties cannot be done without exacerbating my debilitating symptoms compromising my ability to provide a safe and static to my patients (See "Evolution & Progression of my Symptoms" addendum

What duties of your occupation are you unable to perform?

**F. Information About Other Disability Income.** This information is important to ensure the accuracy of your disability benefit calculation.

You may be receiving income from other sources that could impact your benefit from Unum. Please indicate what other income benefits you are eligible to receive or are receiving as a result of your disability.

| Source of Income: | Name of Insurance Carrier (if applicable) | Policy or ID No. | Benefit Amount Weekly/Monthly | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|---|
| Other Disability Insurance | Guardian/Berkshire | HO363805 | $3,356/mo | Some time as yous 7/15 | Pending | |
| Social Security/Disability | Ø | | | | | |
| Social Security/Other | Ø | | | | | |
| Unemployment | Ø | | | | | |
| Workers' Compensation | Ø | | | | | |
| State Disability Plan (CA, HI, NJ, NY, PR, RI) | Ø | | | | | |

CL-1020 (06/13)                                       5

---



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

| INDIVIDUAL STATEMENT (Continued) Please print your name and date of birth below for identification purposes |
|---|

| Individual's Name (Last Name, Suffix, First Name, MI) | | | | | | | | | | | | | | | | | | | Date of Birth (mm/dd/yy) |
|---|

M C G I N N I S | D A W N | J          6 5

**G. Information About Premium Funding for the Policy Year of Disability.** The following information will ensure your benefit is taxed appropriately according to Federal and State regulations

Does your employer have any involvement (direct payment, payroll deduction, cafeteria plans, etc.) with the premium payment(s) for your Individual Disability coverage?  ☐ Yes  ☒ No

**H. Information About Physicians, Hospitals and Medications**

Please provide the following information about all your current medical treatment providers (physicians, hospitals, physical therapists, etc.). If you are being treated by more than three, please share the following information for each provider on a separate sheet of paper and include it with this form.

1. _See "List of treating Providers" (2 pages)_

| Provider Name | Mailing Address | Telephone No. ( ) |
|---|---|---|
| Specialty | City          State          Zip | Fax No. ( ) |
| Date of Last Visit (mm/dd/yy) | Date of Next Visit for this Condition (mm/dd/yy) | ( ) |

2.

| Provider Name | Mailing Address | Telephone No. ( ) |
|---|---|---|
| Specialty | City          State          Zip | Fax No. |
| Date of Last Visit (mm/dd/yy) | Date of Next Visit for this Condition (mm/dd/yy) | |

3.

| Provider Name | Mailing Address | Telephone No. ( ) |
|---|---|---|
| Specialty | City          State          Zip | Fax No. |
| Date of Last Visit (mm/dd/yy) | Date of Next Visit for this Condition (mm/dd/yy) | |

Please list any hospital emergency room visits/admissions you have had in the last 12 months. If you have had more than two, provide the following information for each emergency room visit/admission on a separate sheet of paper and include it with this form.

1. _None_

| Hospital/Facility Name | Address | Date of Visit/Admission (mm/dd/yy) |
|---|---|---|
| Procedure | City          State          Zip | Date of Discharge (mm/dd/yy) |

2.

| Hospital/Facility Name | Address | Date of Visit/Admission (mm/dd/yy) |
|---|---|---|
| Procedure | City          State          Zip | Date of Discharge (mm/dd/yy) |

Please list all current medications. If you are taking more than five, provide this information for each prescription on a separate sheet of paper and include it with this form.

| Prescription Name | Dosage | Prescribing Physician | Pharmacy Name |
|---|---|---|---|
| 1. Skelexin (Metaxalone) | 800mg | Zoran Maric MD | CVS (602) - 728-0437 |
| 2. Valium (diazepam) | 5mg | Zoran Maric MD | CVS (602) - 728-0437 |
| 3. Norethindrone | 0.35mg | Kathleen Schwartz | CVS (602) - 728-0437 |
| 4. | | | |
| 5. | | | |

CL-1020 (06/13)                          6



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

| INDIVIDUAL STATEMENT (Continued) |
| --- |

Employee/Individual's Name (Last Name, Suffix, First Name, MI)

| N | C | G | I | N | N | I | S | | D | A | W | N | | J | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Date of Birth (mm/dd/yy)

| | | | | 6 | 5 |
|---|---|---|---|---|---|

**Fraud Warning:** For your protection, Arizona law requires the following to appear on this claim form:

Any person who knowingly and with the intent to injure, defraud or deceive an insurance company presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud Warning:** For your protection, New York law requires the following to appear on this claim form:

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**I. Signature of Employee/Individual**

I have read and understand the fraud notices listed on pages 2 and 3 of this form. I also acknowledge that should my claim be overpaid for any reason it is my obligation to repay any such overpayment. The above statements are true and complete to the best of my knowledge and belief. **(Your signature is required for benefit consideration.)**

X  _Dawn M McGinnis MD_

**Signature**

_7/10/2015_

**Date**

**Reminder:** Please sign and date the Authorization (last page of this claim form).

CL-1020 (06/13)

7

---

*Claimant Name: Dawn J McGinnis     Claim #:  11107633*



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959  Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

---

**OCCUPATION DESCRIPTION** Please provide the following information about your occupation.

**A. Information About You**

Individual's Name (Last Name, Suffix, First Name, MI)

| M | C | G | I | N | N | I | S | | D | A | W | N | | J | | | | | | | |

Date of Birth (mm/dd/yy): 6 5

**B. Information About Your Occupation**

Job Title: M.D. Anesthesiologist

Nature of Business: Practice of Anesthesiology

Years with current employer: Sole proprietor working as group with other six proprietors 17 yrs

Years in Occupation: 17 yrs

Annual Income: 400 - 543,000 / year

Please advise the name, title, and telephone number of the person we should contact for additional information about your occupational duties.

Name: Steve Donahue MD

Title: MD Anesthesiologist

Telephone Number: ( ) 8086

Are you currently self-employed? ☒ Yes ☐ No   If yes, employer name: Dawn J. McGinnis MD

Telephone Number: 7627

Do you work for another employer? ☐ Yes ☒ No   If yes, employer name:

Telephone Number:

Do you have ownership interest in the business? ☒ Yes ☐ No   If yes, in what percent? 100 %
Type of business entity: ☐ Regular Corporation  ☐ S Corporation  ☐ Partnership  ☒ Sole Proprietorship

List and describe your occupational duties.

| Duty | Hours Spent Each Week: 50 |

Description: See "Daily Activities and duties of An Anesthesiologist" addendum

| Duty | Hours Spent Each Week: |

Description:

| Duty | Hours Spent Each Week: |

Description:

| Duty | Hours Spent Each Week: 1½ - 3 hrs |

Description:

---

Does your occupation require travel (other than to and from work)? ☒ Yes ☐ No   If yes, how many hours do you travel per week?

Do you supervise others? ☐ Yes ☒ No   If yes, how many people do you supervise? None

How has your medical condition impacted your ability to perform these occupational duties?

Yes, please see "Evolution and progression of my symptoms of Spinal Stenosis" addendum for full explanation

CL-1020 (06/13)                                                                 8



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

---

**OCCUPATION DESCRIPTION (Continued)** Please print your name and date of birth below for information purposes

Individual's Name (Last Name, Suffix, First Name, MI)

| M | C | G | I | N | N | I | S | | D | A | W | N | | J | | | | | | | | | | |

Date of Birth (mm/dd/vy)  6  5

In an 8 hour workday the job requires: *Please see "Physical requirements of the Anesthesiologist" addendum for full explanation*

**Physical Requirements:**

| (% of time performed) | Never | Occasionally (1 - 33%) | Frequently (34 - 66%) | Constantly (67 - 100%) | Item | Weight |
|---|---|---|---|---|---|---|
| Sitting | ☐ | ☒ | ☒ | ☐ | | |
| Standing | ☐ | ☐ | ☒ | ☐ | | |
| Walking | ☐ | ☐ | ☒ | ☐ | | |
| Climbing (Stairs) | ☐ | ☒ | ☐ | ☐ | _____ | _____ |
| Balancing | ☐ | ☒ | ☐ | ☐ | _____ | _____ |
| Bending/Stooping | ☐ | ☐ | ☒ | ☐ | _____ | _____ |
| Kneeling | ☐ | ☒ | ☐ | ☐ | _____ | _____ |
| Squatting/Crouching | ☐ | ☒ | ☐ | ☐ | _____ | _____ |
| Crawling | ☐ | ☒ | ☐ | ☐ | _____ | _____ |
| Reaching | ☐ | ☐ | ☐ | ☒ | _____ | _____ |
| Twisting | ☐ | ☒ | ☐ | ☐ | _____ | _____ |
| Carrying | ☐ | ☒ | ☒ | ☐ | _____ | _____ |
| Pushing/Pulling | ☐ | ☐ | ☒ | ☐ | _____ | _____ |
| Lifting | ☐ | ☐ | ☒ | ☐ | _____ | _____ |
| Hand Use -Simple Grasping | ☐ | ☐ Right ☐ Left | ☐ Right ☐ Left | ☒ Right ☒ Left | | |
| Hand Use -Fine Manipulation | ☐ | ☐ Right ☐ Left | ☐ Right ☐ Left | ☒ Right ☒ Left | | |
| Hand Use- Repetitive Motion | ☐ | ☐ Right ☐ Left | ☐ Right ☐ Left | ☒ Right ☒ Left | | |

Dominant Hand   ☒ Right   ☐ Left

Are there any other physical requirements of your occupation that you are unable to do as a result of your medical condition?  ☐ Yes  ☐ No
If yes, please explain: *If I am not in an exacerbation I can perform the duties and activities of an Anesthesiologist. However, these duties cannot be done without exacerbating my debilitating symptoms compromising my ability to provide a safe anesthetic to my patients.*

Does your occupation require the performance of repetitive tasks? ☒ Yes ☐ No If yes, please describe: *See "Evolution and Progression of my Symptoms" addendum* *See "Daily activities and duties of an Anesthesiologist" addendum*

**Cognitive Requirements:** Does the job require (check all that apply)?
☒ working under emergency, critical or dangerous situations.
☒ meeting deadlines.
☒ attention to detail.
☒ day-to-day contact with others (co-workers and/or the public).
☒ making independent decisions.

Are there any other cognitive requirements of your occupation that you are unable to do as a result of your medical condition?  ☐ Yes  ☒ No
If yes, please explain:

**Equipment:** Describe all equipment used to perform your occupation: *Anesthesia Machine, Anesthesia cart with supplies and medications, ventilating & intubating equipment, patient warming devices, positioning devices, blood warmers, syringes, needles (IV solutions, Monitors, ventilator, line placement supplies*

**Environmental Conditions:** Please check the amount of time you are exposed to the following elements: ( See "Daily Activities & duties" addendum)

| | Never | Occasionally (1 - 33%) | Frequently (34 - 66%) | Constantly (67 - 100%) | |
|---|---|---|---|---|---|
| Heat | ☒ | ☐ | ☐ | ☐ | Temperature: N/A |
| Cold | ☐ | ☐ | ☐ | ☒ | Temperature: 60-65° |
| Dust, Fumes, Gases | ☐ | ☐ | ☒ | ☐ | |
| Vibrations | ☐ | ☒ | ☐ | ☐ | |
| Any Other | ☐ | ☒ | ☐ | ☐ | Description: Wetness |

Noise Intensity   ☐ Quiet  ☒ Moderate  ☐ Loud

CL-1020 (06/13)                                     9

---

Claimant Name: Dawn J McGinnis        Claim #:  11107633



**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

---

**OCCUPATION DESCRIPTION (Continued)** Please print your name and date of birth below for information purposes

Individual's Name (Last Name, Suffix, First Name, MI) | | Date of Birth (mm/dd/yy)
M C G I N N I S | D A W N | J | | | | | | | | | | | 6 5

**C. Information About Your Previous Work Experience**

Please list any previous employment including any other positions held with your current employer.

| Occupational Title | Employer Name | Dates Employed |
|---|---|---|
| Anesthesiology Residency | Maricopa Medical Center | 1994 - 1998 |
| Laboratory technition & assistant | Oral Robert University - Biology dept | 1983 - 1987 |
| Cashier | Crown Buick dealership | 1988 - 1990 |
| Sales | Fashion Warehouse | 1981 - 1982 |

**D. Information About Your Education and Licenses**

Please check highest level of education completed.

☒ Post Graduate – Years completed _14 yrs_

☐ College – Years completed _____

☐ Trade/Vocational School – Years completed _____

☐ GED – Date received _____

☐ High School – Years completed _____
  (See CV)

4 years Undergraduate school at Oral Roberts University (Biology degree)

2 years Pharmacy school (did not graduate because I was accepted into medical school)

4 years Medical School (MD) at University of Oklahoma

4 years Anesthesiology residency at Maricopa Medical Center (MD Anesthesiologist)

Please list all degrees, diplomas, certificates and licenses obtained. License holders should indicate the states of licensure and the expiration date of the licenses.

| Degrees, diplomas, certificates and licenses.  (See Above) | State of Licensure | Expiration Date of License |
|---|---|---|
| Medical license | Arizona | 4/12/17 |
| DEA number | Arizona | 1/31/16 |
| Diplomat of the American Board of Anesthesiology since 1999 | N/A | N/A |
| Member of American Society of Anesthesiologists | N/A | Member since 1993 - No exp |
| Member of Az Society of Anesthesiologists | N/A | Member in Arizona since 1998 - No exp |

**E. Signature of Individual**

The above statements are true and complete to the best of my knowledge and belief.

X _Dawn J McGinnis MD_      7/10/2015

Signature                                        Date

---

CL-1020 (06/13)                          10

 **unum®**

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959  Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

You are not required to sign this Optional Authorization. However, if you would like us to communicate with a family member, friend or other third party about your claim, we recommend completing the information below. Please sign and date the form as indicated and mail or fax it to the address or fax number indicated above.

### Optional Authorization to Disclose Information to Third Parties

To assist in the evaluation or administration of my claim(s), I authorize Unum Group, its subsidiaries and duly authorized representatives ("Unum") to share personal health and financial information relating to my claim with the family members, friends, and/or other third parties listed below:

My Spouse: _____ None _____

      (Name)                                      (Telephone Number)

Other Family Member: _____ None _____

      (Name / Relationship)                            (Telephone Number)

Other person: _____ None _____

      (Name / Relationship)                            (Telephone Number)

I authorize Unum to leave messages about my claim on my voicemail / answering machine.
☒ Yes  ☐ No

I understand that information about my claim may include information about my health and that such information about my health may be related to any disorder of the immune system including, but not limited to, HIV and AIDS; use of drugs and alcohol; and mental and physical history, condition, advice or treatment, but does not include psychotherapy notes.

I do not wish the following information about my claim to be shared (leave blank if not applicable):

_____

I further understand that the information is subject to redisclosure and might not be protected by certain federal regulations governing the privacy of health information.

I may revoke this authorization in writing at any time except to the extent Unum or the authorized recipient of my information has relied on it prior to receiving my notice of revocation. I may revoke this Authorization by sending written notice to the address above.

This authorization is valid for the shorter of two (2) years or the duration of my claim. I may request a copy of the Authorization and a copy shall be as valid as the original.

_Dawn McGinnis MD_ _____     _7/10/15_ _____
Individual's Signature                                                Date

_DAWN J. McGINNIS M.D_ _____     _2675_ _____
Printed Name                                                    Social Security Number

I signed on behalf of the claimant as _____ N/A _____ (indicate relationship). If Power of Attorney Designee, Personal Representative, Guardian, or Conservator, please attach a copy of the document granting authority.

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

Claimant Name: Dawn J McGinnis      Claim #:  11107633

segmentr9page



**DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100158, Columbia, SC 29202-3158
Pacific Time Zone      Toll-free: 1-877-851-7637   Fax: 1-877-851-7624
All Other Time Zones   Toll-free: 1-800-858-6843   Fax: 1-800-447-2498
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time)

Please sign and return this authorization to The Benefits Center at the address above. You are entitled to receive a copy of this authorization. This authorization is designed to comply with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule.

## Authorization to Collect and Disclose Information
### (Not for FMLA Requests)

**I authorize the following persons:** health care professionals, hospitals, clinics, laboratories, pharmacies and all other medical or medically related providers, facilities or services, rehabilitation professionals, vocational evaluators, health plans, insurance companies, third party administrators, insurance producers, insurance service providers, consumer reporting agencies including credit bureaus, GENEX Services, Inc., The Advocator Group and other Social Security advocacy vendors, professional licensing bodies, employers, attorneys, financial institutions and/or banks, and governmental entities;

**To disclose information,** whether from before, during or after the date of this authorization, about my health, including HIV, AIDS or other disorders of the immune system, use of drugs or alcohol, mental or physical history, condition, advice or treatment (except this authorization does not authorize release of psychotherapy notes), prescription drug history, earnings, financial or credit history, professional licenses, employment history, insurance claims and benefits, and all other claims and benefits, including Social Security claims and benefits ("My Information");

**To Unum Group and its subsidiaries,** Unum Life Insurance Company of America, Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, and persons who evaluate claims for any of those companies ("Unum");

**So that Unum may evaluate and administer my claims, including providing assistance with return to work.** For such evaluation and administration of claims, this authorization is valid for two years, or the duration of my claim for benefits, whichever is shorter. I understand that once My Information is disclosed to Unum, any privacy protections established by HIPAA may not apply to the information, but other privacy laws continue to apply. Unum may then disclose My Information only as permitted by law, including, state fraud reporting laws or as authorized by me.

**I also authorize Unum to disclose My Information to the following persons** (for the purpose of reporting claim status or experience, or so that the recipient may carry out health care operations, claims payment, administrative or audit functions related to any benefit, plan or claim): any employee benefit plan sponsored by my employer; any person providing services or insurance benefits to (or on behalf of) my employer, any such plan or claim, or any benefit offered by Unum; or, the Social Security Administration. Unum will not condition the payment of insurance benefits on whether I authorize the disclosures described in this paragraph. For the purposes of these disclosures by Unum, this authorization is valid for one year or for the length of time otherwise permitted by law.

**Information authorized for use or disclosure may include information which may indicate the presence of a communicable or non-communicable disease.**

If I do not sign this authorization or if I alter or revoke it, except as specified above, Unum may not be able to evaluate or administer my claim(s), which may lead to my claim(s) being denied. I may revoke this authorization at any time by sending written notice to the address above. I understand that revocation will not apply to any information that Unum requests or discloses prior to Unum receiving my revocation request.

_Daniel M. McGinnis MD_        _7/10/15_
Insured's Signature       Date Signed

_Dawn J. McGinnis MD_        _-2675_
Printed Name       Social Security Number

I signed on behalf of the Insured as _____ _N/A_ _____ (Relationship). If Power of Attorney Designee, Guardian, or Conservator, please attach a copy of the document granting authority.
CL-1020-AUTH (06/13)

Claimant Name: Dawn J McGinnis      Claim #:  11107633

## WORKING ENVIRONMENTAL CONDITIONS FOR THE ANESTHESIOLOGIST

1. **HEAT:** Not an issue usually.

2. **COLD:** The operating room is on the average 60-65 degrees continuously. (constantly)

3. **DUST, FUMES, GASES:** We are exposed to anesthetic gases, especially with mask ventilation and pediatric mask inductions. We are also exposed to gases/ fumes/smoke from the cauterization device that burns and cuts flesh during surgery. The laser device also gives off fumes/smoke and we need to wear special masks around our face and nose to decrease the risk of infection from viruses that are aerated. (frequently)

4. **WETNESS:** Depends on the type of procedure being done. It is common for saline fluids contaminated with blood to run onto the floor causing some flooding during arthroscopy cases. This includes scopes of the knee and shoulder. Urology scope cases can also cause flooding onto the floors. Many procedures cause blood to run off the OR table onto the floor. (occasionally)

5. **VIBRATIONS:** Vibrations are common with orthopedic (bone) procedures that use electric saws and manual hammers. (occasionally)

6. **NOISE INTENSITY:** I try to keep the level of noise down so I can hear my monitors beeping and the warning bells. Some surgeons play music during the procedure at various intensities. The bone saws and hammers are pretty loud but are usually used in short intervals. (moderate)

```
                            Document Detail
------------------------------------------------------------------------

Checked/Unchecked Indicator: No

Document ID: 2015071316100126F523

Entry Date: 07/13/2015 16:10:01

Received Date: 07/13/2015

Date Added to Claim: 07/13/2015

Primary Doc Type: Claim Form

Secondary Doc Type: Other

Medical Provider:

Document Notes: APQ  07/10/15

Work Notes:
```

*Claimant Name: Dawn J McGinnis      Claim #:  11107633*

**PHYSICIAN QUESTIONNAIRE**
The Benefits Center
P.O. Box 100262
Columbia, SC 29202
Toll Free: 1-888-226-7959    Fax: 1-866-562-4794

**Instructions:**    For Group-sponsored policies – the employer should complete this form.
For individual policies – the insured should complete this form.

| Claimant's Name: Dawn J. McGinnis MD | Social Security Number: -2615 |
|---|---|
| Policy Numbers: 01826705890 | Job Title: MD Anesthesiologist |

| Years with employer: (Self employed) 17 years | Years in occupation: 17 years | Annual Income: $400 - 543,000 |
|---|---|---|

Please check the applicable type of business entity and provide the claimant's ownership percentage, if applicable:

X Sole Practitioner    ☐ Partnership _____%    ☐ Practice/Group Practice _____%

Please check the type of practice the claimant is engaged in:

X Private Practice   ☐ Hospital or Clinical   ☐ Government or Municipality   ☐ Other (i.e. Military, Teaching, etc.).

Indicate field(s) of specialty.    _MD Anesthesiologist_

Was the claimant practicing full time in his or her specialty immediately prior to disability? Yes _X_  No _____

If the answer to above question is "NO", please indicate in what area of medicine the claimant was actually practicing (i.e., General

Practice, Administration, etc.) ___ _N/A_

What is the percentage of time spent in office seeing patients ____0____% (Medical Charting / Records, orders, credentialing
What is the percentage of time spent performing administrative tasks ___5___% forms, License Renewals, Billing Sheets, etc)
What is the percentage of time spent doing hospital rounds ___0___%
What is the percentage of time spent working with medical students/interns ___0___%.  (OR)
Indicate treatment techniques performed. _General Anesthesia in the operating room both inpatient and_
_outpatient, sedation, general anesthesia, nerve blocks, spinal & epidural_
_anesthesia, pain management in the OR and recovery stay._

If surgery is a part of the claimant's job duties, please list procedures typically performed and the hours per week spent in surgery.
_I am not a surgeon, I am an anesthesiologist working in the OR before_
_the onset of disability. I administer anesthesia to the patients so_
_surgery can be accomplished._
_Average time spent in OR per week is 50 hours._

How often is the claimant on call?    _4 - 5 days / month_

Please list all affiliations with Hospitals and/or Universities
_St. Joseph's Hospital and Medical Center and outpatient surgery center_
_Good Samaritan Hospital and outpatient surgery center_
1111-02-WORC (06/08)
_(I also worked in various other surgery centers not associated with a hospital)_

Claimant Name:  Dawn J McGinnis        Claim #:   11107633

Physician Questionnaire – Page Two

Average hours the claimant worked per week for the one-year period prior to disability:

a) At your specific specialty __50__ hours:       from _6:30_ am/pm to _5:00_ am/pm

b) At your office __0__ hours:                    from _____ am/pm to _____ am/pm

c) At a hospital __50__ hours: & Outpatient       from _6:30_ am/pm to _5:00_ am/pm
   Surgery Centers

d) Other _____ hours:                        from _____ am/pm to _____ am/pm

If the claimant is working part time, please list the hours working per day:

From __N/A__ am/pm to _____ am/pm.

Number of hours traveled each week for job (excluding to and from work) _1½-3_ hours.

Who does the medical billing for this practice?
PCA Anesthesia Services
3000 W. Claredon Ave Suite # 142
Phoenix, Az 85013    (602)-234-1805    Fax (602)-234-3748

**Please forward, under separate cover if necessary, CPT/ADA codes billed for the 12 month period preceding claim. (included)

Number of persons the claimant supervised and their titles:
0

PLEASE LIST OTHER DUTIES NOT INDICATED:

Duty _____N/A_____          Hours spent each week _____
Description _____

Duty _____          Hours spent each week _____
Description _____

Duty _____          Hours spent each week _____
Description _____

Duty _____          Hours spent each week _____
Description _____

Please describe sitting, standing and walking requirements and durations (indicating any uninterrupted periods of time and total per day). Please also indicate if job can be performed by alternating sitting and standing.

Administration of anesthesia mostly encompasses standing & bending over the patient for direct care, continuosly moving in the operating room (OR) and walking to & from preoperative area, the OR and the recovery room for each patient and with the patient. Sitting is only an option in longer stable cases. Some days the case turnover time is so rapid there is no time to sit at all. (Please see "Daily activities & Of the above duties, please list those that the claimant is able to perform at this time. duties of anesthesiologist" addendum) While I can stand, push the beds and patients bend over & administer anesthesia. I cannot do these activities without exacerbating my debilitating symptoms that cause low back pain and severe muscle spasm (putting the patient at risk) Since this low back pain and muscle spasm can occur unpredictably, I cannot perform my duties as an anesthesiologist safely.
(See "Evolution and progression of my symptoms of spinal stenosis" addendum)

Claimant Name: Dawn J McGinnis        Claim #:   11107633

Physician Questionnaire – Page Three

How has disability affected the claimant's performance of the job?
_See "Evolution and Progression of my Symptoms" of Spinal Stenosis"_
_Addendum for full explaination_

Cognitive Requirements:

Does this job require (check all that apply):
A.  the performance of duties under stress when confronted with emergency, critical, unusual or dangerous situations ✓
B.  maintaining working speed, i.e. meeting deadlines in the performance of duties ✓
C.  sustained attention in the performance of duties ✓                    * _as may occur in early or late_
D.  the performance of work where supervision or contact with others is minimal ✓ *  _hours at outpatient center or_
E.  regular contact with others (co-workers and/or public) in the performance of duties ✓ — _in ancillary parts of the hospital)_
F.  making independent judgments ✓
G.  the performance of repetitive tasks ✓.  If so, please describe _See "Daily activities and duties of_
_an Anesthesiologist" addendum for full explaination_

| IN TERMS OF AN 8 HOUR WORKDAY, THE JOB REQUIRED: See "Daily activities and duties" addendum |
|---|

Lifting:  (check all height categories that apply)    Items lifted: _Equipment IV_
| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From: | ☒ Flour | ☒ Knee | ☒ Waist | ☒ Chest | ☒ Shoulder | ☒ Above head | _Poles, bags of fluids,_ |
| To: | ☒ Floor | ☒ Knee | ☒ Waist | ☒ Chest | ☒ Shoulder | ☒ Above head | _monitors, drug drawers_ |

_Patients, body parts_
Describe overhead work: _Working monitors, plugging in equipment, moving screens, OR lights, IV fluids +_  _poles (ct_

| Maximum lbs: | 1 | 2 | 3 | 4 | 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | Over 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Frequently: | O | O | O | O | O | O | O | Ⓞ | O | Ⓞ | O | O | O | O | O | O | O | O | O | O | O |
| Occasionally: | O | O | O | O | O | O | O | O | O | ☒ | O | O | O | O | O | O | O | O | O | O | O |

_Drug drawers_        See "Daily activities and duties" addendum for full explaination
_equipment +_

| | | | | |
|---|---|---|---|---|
| Carrying: | Item _Monitors_ | Weight _20-30 lbs_ | Distance _10 or more_ | Times per day _1-3 x's/d_ |
| Pushing/Pulling: | Item _Patients +_ | Weight _varies_ | Distance _varies_ feet | Times per day _at least 5x's_ |

✶ _Beds or Table_
_equipment, Anesthesia machine + cart_    (_depends on # _)   _per patient_
(_# type of cases scheduled_)

| Body Motions: % of time performed | Not Required | Occasionally 1 to 33% | Frequently 34 to 66% | Constantly 67 to 100% |
|---|---|---|---|---|
| A. Climbing* _(Stairs)_ | O | X | | |
| B. Balancing | O | X | | |
| C. Bending/Stooping | O | | | X |
| D. Kneeling | O | X | | |
| E. Squatting/Crouching | O | X | | |
| F. Crawling | O | X | | |
| G. Reaching | O | | | X |
| H. Use Foot Control | O | X | | |
| I. Twisting | O | | X | |
| J. Hand Use -Simple Grasping | O | Right __ Left __ | Right __ Left __ | Right X Left X |
| K. Hand Use -Fine Manipulation | O | Right __ Left __ | Right __ Left __ | Right X Left X |
| L. Hand Use- Repetitive Motion | O | Right __ Left __ | Right __ Left __ | Right X Left X |

Describe any other equipment, including computer, used to perform job: _Computer, Anesthesia machine with ventilator,_
_Anesthesia cart, glidescope and intubating equipment, blood warmer, rolling beds,_
Indicate claimant's hand dominance: _X_ Right hand _____ Left hand   _ventilatory equipment (etc_
(_See "Daily activities + duties"_
_addendum)_

Claimant Name: Dawn J McGinnis      Claim #:  11107633

Physician Questionnaire – Page Four   *See "Working environmental conditions" addendum*

| Environmental Conditions: | Not Required | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| % of time exposed | | 1 to 33% | 34 to 66% | 67 to 100% |
| A. Heat | X | | | |
| B. Cold | | | | X |
| C. Dust, Fumes, Gases | | | X | |
| D. Wetness | | X | | |
| E. Vibrations | | X | | |
| F. Noise Intensity   Very Quiet | Quiet | Moderate   X   Loud | | Very Loud |

Additional comments on Physical Requirements: *See "Daily activities and duties" addendum for full explaination*

**Previous Employment** (Please include any other positions held with current employer):

| Occupational Title | Employer Name | Dates Employed |
|---|---|---|
| Anesthesiology resident | Maricopa Medical Center | 1994 - 1998 |

Please list any other employment.
Lab technician and assistant in undergraduate school
Cashier in a car dealership
Worked various jobs waitressing and in sales for a department store and a gift shop
Worked some summers in a computer factory assembling computer parts.

Does the claimant have a non-compete agreement with current employer?   Yes ___   No X

Indicate the highest level of education completed by the claimant.
4 years Undergraduate School (Biology degree)
2 years Pharmacy School (did not graduate because I was accepted to medical school)

X Post Graduate – Years completed *14 years*
O Other Graduate Degrees
O Other College Education ___
4 years Medical School (M.D)
4 years Anesthesiology residency (MD, Anesthesiology)

(See CV)

Please specify degree(s), diploma(s), certificate(s); license(s)** and area of concentration, professional associations, board certifications, licenses in other professions.
**License holders should indicate the state(s) of licensure and the expiration date of the license(s).
Medical license state of Arizona #24002 Renewed for 2 years on 4/12/15
DEA number exp 1/31/16 State of Arizona
Diplomat of the American Board of Anesthesiology 1999
American Society of Anesthesiologists member & Arizona chapter member since 1998
I HEREBY DECLARE THAT ALL STATEMENTS GIVEN HEREIN ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| Dated   7-10-2015 | Signed   Dawn McGinnis MD |
|---|---|
| Printed Name of Person Completing Form | Title of Person Completing Form |

Claimant Name: Dawn J McGinnis      Claim #:   11107633

```
                          Document Detail
--------------------------------------------------------------------------------
Checked/Unchecked Indicator: No

Document ID: 20150713161459171111

Entry Date: 07/13/2015 16:13:54

Received Date: 07/13/2015

Date Added to Claim: 07/13/2015

Primary Doc Type: Claim Form

Secondary Doc Type: Other

Medical Provider:

Document Notes: Addendums

Work Notes:
```

**LIST OF TREATING PROVIDERS:**

| NAME | ADDRESS | TELEPHONE # | DATES OF TREATMENT |
|------|---------|-------------|--------------------|
| Zoran Maric MD<br>OrthoArizona<br>Spine Surgeon | 333 W Thomas Rd Suite# 202<br>Phoenix, Az 85013 | (602)-274-0480<br>F: (602)-274-2271 | 5/12/2010 to present<br>6/17, 6/23/2015 |
| Nicholas Theodore MD<br>Barrow Neurosurgical Associates<br>Neurosurgeon | 2910 N 3rd Ave Phoenix, Az 85013 | (602)-406-3181<br>F: (602)-264-2417 | 7/1/2010 |
| Raj Singh MD<br>Barrow Neurosurgical Associates<br>Neurologist and Neuro Rehab | 2910 N 3rd Ave Phoenix, Az 85013 | (602)-406-3181<br>F: (602)-264-2147 | 7/13/2010 to<br>2/28/2011 |
| Rick Little PT<br>Barrow Neurosurgical Associates<br>Physical Therapy | 2910 N 3rd Ave Phoenix, Az 85013 | (602)-406-3181<br>F: (602)-264-2417 | 7/27/2010 to<br>5/12/2011 |
| David Kush MD<br>Anesthesiologist<br>Performed Epidurals | 300 W Claredon Ave Ste#142<br>Phoenix, Az 85013 | (602)-234-1803<br>F: (602)-234-3748 | 6/11, 6/17, and<br>7/1/2010 |
| Nida K. Laurin MD<br>NKL Neurology<br>Neurologist | 9458 E Ironwood Square Dr. #101<br>Scottsdale, AZ 85258 | (480)-314-2099<br>F: (480)-314-2313 | 9/21 and 9/29<br>2010 |

*Claimant Name: Dawn J McGinnis     Claim #:  11107633*

| NAME | ADDRESS | TELEPHONE # | DATES OF TREATMENT |
|---|---|---|---|
| Michael Powers MD<br>Affiliated Neurologists, LTD<br>Neurologist | 525 N 18th St, Suite #602<br>Phoenix, Az 85006 | (602)-271-0950<br>F: (602)-258-1386 | 3/21/2011 |
| Jack O. Sipperly MD<br>Barnet Dulaney Perkins Eye Ctr<br>Ophthalmologist | 4800 N 22nd Street<br>Phoenix, Az 85016 | (602)-955-1000<br>F: (480)-413-0032 | 7/23, 7/24, and<br>9/9/2010 |
| George Yanik MD<br>Affiliated Eye Surgeons<br>Ophthalmologist | 3330 N 2nd Street<br>Phoenix, Az 85012 | (602)-263-9345<br>F: (602)-263-0778 | 7/7, 7/13/2010 |
| Susan Shelton, L. AC.<br>Shelton Clinic<br>Acupuncture/Oriental medicine | 6630 N 47th Ave Suite #6<br>Glendale, Az 85301 | (623)-937-9125<br>F: (623)-937-1435 | 2010-present |
| Richard Zipnick MD<br>Spine surgeon | Biltmore Medical Mall<br>2222 E Highland # 400<br>Phoenix, Az 85016 | (602)-553-3113<br>F: (602)-667-7991 | 4/2000 |
| Louis Lopez MD<br>Urgent Care and Family Medicine | 521 W Thomas Road<br>Phoenix, Az 85013 | (602)-631-9877<br>F: (602)-631-4093 | 4/10/2000 |

*Claimant Name: Dawn J McGinnis     Claim #:  11107633*

## INFORMATION ABOUT THE CONDITION CAUSING MY DISABILITY

4/10/2010     First time I had symptoms of low back pain, MRI ordered by my primary
              care physician at that time, Louis Lopez MD, MRI done at McAuley
              Outpatient Radiology, 500 W Thomas Rd, suite # 150, Phoenix, Az 85013
              (602)-406-6734.  MRI showed broad-based disc protrusion at L4-L5
              toward the left, mild narrowing of the inferior left neural foramen.
              I was referred to spine Dr. Zipnick on 6/1/2000. Dr. Zipnick prescribed me
              Flexaril but only one dose was taken due to the side effect of severe
              drowsiness.  Dr. Zipnick then prescribed me Skelaxin which has
              less side affects. I have been on Skelaxin since for episodes of back
              pain.  I don't know if this doctor is in practice or moved out of state
              but I never saw him again. I do remember shortly thereafter, I was seen
              by a chiropractor (I don't remember his name and I don't think he
              practices anymore).  I do remember that he treated my back pain with a
              nerve stimulator.  I also remember being scheduled for a lumbar epidural
              with an anesthesiologist but then cancelled the appointment because the
              Skelaxin had worked so well for me.  Over the next 10 years I have had
              periodic times and episodes of low back pain that I took NSAIDS and
              Skelaxin for.  However, I continued to work full time as an
              anesthesiologist.

5/12/2010     Ten years have now passed with periodic back pain and spasm as
              described above until I was at work practicing the regular duties of
              anesthesiology when my legs started feeling numb in the afternoon.  It felt
              like I was "walking on pillows".  My legs became more numb and I
              continued to do cases with my surgeon until 3am.
              I went in for an emergency MRI after talking to Dr. Zoran Maric on 5/13/10.
              MRI showed L4-L5 spondylosis and facet degenerative changes, broad-
              based central-left disk protrusion with annular fissure and mild narrowing
              of the central canal and bilateral neural foramina.  After a day or two I
              I started having severe debilitating back pain which prevented me from
              standing upright.  The area around L4-L5 was intensely painful to touch &
              the numbness in my legs turned into an unbearable extremely intense
              "burning" sensation from L4-L5 (the waist) down both of my legs and into
              the feet.  The area was so painful to the touch that I could not wear any
              underclothing or any clothing around my waist or legs.  I wore loose fitting
              dresses for well over a year.  My feet were not only burning but it felt like I
              walking on a bed of nails.  The heat of outdoors would make the pain
              unbearable and I could not wear anything on my feet but flip flops.  I could
              not walk barefoot until only recently.  The burning and the pressure of the
              friction on my back was intolerable with walking.  Both the back pain and

neurologic pain were excruciating. If you would touch my legs or buttocks or feet you feel intense heat radiating from that area of the body while the rest of my body was normal temperature. I was not able to sit in a chair that would press on the L-L4 area. I was only able to sit or stand for minutes at a time and had to lay down to relieve the pressure from the the spine. I spent the next 6 months laying down 90% of the day and only doing necessary things including going to the bathroom and showering. My mother had to live with me during this time of my disability. I took hot baths with epson salts to try to relax the spasm of the back muscles. Then I put cold Biofreeze gel on the lumbar back area to cool the back. And because of the hot water from the baths my neurologic symptoms would become even more unbearable so I had to sleep on a cold gel mattress and wore cold gel booties that I kept in the freezer and exchanged out. I could not lay on my back for the next year without excruciating pain. My legs and even my skin began to hurt to touch. I had to get into the freezing cold pool naked for a few minutes, get into bed hunched over and sleep on my left side on a cold mattress from the freezer without anything touching, no covers, just to get one hour of sleep before I would wake up again "on fire".

Dr. Maric did not recommend surgery but did prescribe a series of epidural steroid injections with Dr. Kush. I completed a series of 3 injections and after a few days after the 3rd injection I woke up with blurry vision without distance vision nor depth perception. I then went to see Dr. Yanik, an ophthalmologist, who did a retinal study which showed retinal detachment in both eyes due to fluid build up behind the retinas from steroid side effects. I then went to see Dr. Sipperly, another ophthalmologist, who specializes in retinal issues who confirmed findings and recommended doing nothing as most of these cases resolve within the next year without laser surgery. I did not have full normal vision until about a year or so later.

I did get a second opinion from Dr. Theodore at BNI (Barrow's Neurological Institute) about my back. He agreed with Dr.Maric and did not think surgery was appropriate. However, he referred me to Dr. Singh for a neurology consultation, physical therapy and rehabilitation. I then had a full workup with Dr. Singh, including EMG studies and he set me up with Mr. Rick Little for physical therapy. I worked with them doing everything recommended for almost a year. Dr. Singh wanted to rule out multiple sclerosis and sent me to see Dr. Laurin who did a full work up including extensive lab tests and a brain study. The MRI of my brain showed no evidence of demyelinating disease, so multiple sclerosis was ruled out and I was sent back to Dr. Singh to continue under his care and physical therapy. I was also referred by Dr. Maric to Dr. Powers, another neurologist, for a third neurologic opinion.

It was during this time that I filed my first claim with you for disability. Over the months the back pain lessened but the "burning, "walking on nails" feeling and pain from L4-L5 on down my legs and feet persisted. It has lessened over the last 5 years but still persists and has not completely resolved.  It has become bearable and I went back to work about a year after these symptoms first started.

I started seeing Susan Shelton for acupuncture, as another option, months after all this started and she has been treating me since for back pain and the neurologic pain.  She has prescribed me supplements for muscle spasm, natural anti-inflammatory supplements, and alpha lipoic acid, (anti-oxidant) for the nerve pain.

I have also been going to reflexology for the last 5 years to help relieve the neurologic symptoms.

Since going back to work in 2011, I have had recurrent episodes of back pain and muscle spasm that have progressively gotten more intense, and more frequent especially this last year.  The neurologic pain seems to have stabilized at about 20% the original intensity from 2010 and remains the same.  However, the symptoms intensify when I have a long working day and when I am on call and on my feet for long periods of time.  I have been wearing special shock absorbing shoes everyday to work since 2010.

Over the years I have had repeat MRI's from Dr. Maric and Dr. Singh when I would have more severe episodes.  Dr. Maric has been prescribing me Valium and Skelaxin as episodes would occur.

My main diagnosis has been spinal stenosis and unfortunately my duties as an anesthesiologist continue to exacerbate my symptoms.  As I continue to work as an anesthesiologist, episodes of back pain and spasm have become more frequent and more difficult to recover from and have become unpredictable in onset putting myself and patients at risk for injury and possible death. Please see addendum on "Daily Activities and Duties of an Anesthesiologist" to understand how the practice of anesthesiology affects patients and myself.

5/15/2015 I was still working full time practicing anesthesiology on this day.  I had a full day of cases and my last case was added onto my schedule.  It lasted 5 hours, was an obese patient and was a very laborious case.  I completed the day around 6pm and went home.  The next day I had a full schedule.  I woke up early and couldn't move my back due to severe spasm and pain.  I could not get out of bed and could not get up.  I called my office and got someone else, who thankfully had no cases for the day, to take over and do all my scheduled cases.  I called Dr. Maric and he called in a prescription for Skelaxin.  I already had some Valium left over as I use this medication

sparingly so I did not need another prescription for Valium at the time. I took the Valium as I keep them by the bed and slept the entire day. That evening Susan Shelton came to my home to do acupuncture on me for the next few days. I made an appointment with Dr. Maric to see him in his office, then got another MRI. This latest MRI showed: Mild disease degeneration at L4-L5. Mild facet joint arthropathy in the lower lumber spine. At L4-L5 there is a broad-based left paracentral disc protrusion and annular fissure with mild narrowing of the thecal sac, mild right and moderate left lateral recess narrowing. Dr. Maric told me that our options are limited. Surgery is not an option since the risks are high for worsening symptoms. Dr. Maric offered me steroid epidurals or steroids by mouth which we decided that due to the previous episode of bilateral retinal detachment, that steroids would be inappropriate. Lastly, he offered physical therapy which I am willing to do however, PT can only temporarily help with mobility and core strengthening but cannot change the pathology of the spine or fix spinal stenosis. The symptoms will continue to reoccur as soon as it is exacerbated again performing the duties of anesthesiology. The issue will never fix or heal itself. It is a situation that will worsen with age and will continue to cause debilitating pain and spasm with the duties of anesthesiology. At this time, the neurologic symptoms have not worsened. The neurologic symptoms are still currently at 20% level of intensity from initial appearance in 2010. However, I have noticed left heel numbness since last seeing Dr. Maric but it seems to be resolving over the last few weeks.

It is at this point that I decided to file for permanent disability due to the risks of critically injuring a patient and exacerbating my pathology while performing the daily activities and duties of an anesthesiologist.

**DAILY ACTIVITIES AND DUTIES OF AN ANESTHESIOLOGIST**

1. **SETTING UP THE OR:** I set up my room and prepare for the patient's needs before seeing the patient in the preoperative area. Setting up the OR includes, moving the anesthesia machine into proper position, making sure it has passed inspection, checking all the tubes and choosing the appropriate mask and attaching it to the machine, checking the machine for leaks, ensuring anesthetic gases are full, turning on and checking the monitors, and preparing the appropriate airway devices are ready for use and set out. This includes ventilatory equipment such as oral airways, nasal airways, endotracheal tubes, laryngoscope, possibly a glide scope, LMA's, etc. Set up also includes moving anesthesia cart into proper position, getting a drug tray if not stocked, going to a Pyxis machine and taking out narcotics and special medications needed that are not included in the regular drug tray. Set up includes possibly moving the OR table into proper position and making sure it is locked. Blood warmers and tubing is set up with a hot line and line placement equipment and supplies are set out for use, such as: IV's, arterial line catheters and equipment, and central line kits. We ensure a patient warming device is in the room and open the appropriate plastic blanket for the procedure. If any of this equipment is not in the room we have to get the items and equipment from the stock rooms or call an anesthesia technician if they are not busy. We also choose syringes and draw up the appropriate medications and label them. We also set up and put to the side emergency medications.

2. **PREOPERATIVE VISIT AND PATIENT EVALUATION:** After the OR is set up and ready for use I walk to the preoperative unit where the patient is located. Here I find and retrieve the chart, look through medical records, get on the computer to find further information and type in orders as necessary for patient preparation for the OR. I begin anesthetic charting and document all the pertinent medical facts about the patient. I lean over the patient to do a quick physical exam, listen to the lungs and heart, and complete an airway assessment. I talk to the patient to confirm the medical history and determine if any further tests are required, a consultation, or medical treatment is necessary. This would include such things as an EKG, a cardiology or pulmonary consultation, a breathing treatment, a blood sugar, a chest xray, treatment of hypertension or abnormal blood sugar with medications and further testing. I then relay information to the patient about what the anesthetic encompasses and the general procedure. I discuss risks and possible additional lines that may be necessary or problems that are specific to the case type or the patients medical conditions. These things may include information about possible blood transfusions, possible difficult airway, necessary arterial line placement, possible difficulty with getting a patient to breathe on their own at the end of the case requiring ICU stay and mechanical ventilation. After all questions are answered and

risks discussed I have the patient sign a consent for anesthesia.  If I determine any additional equipment, medication or supply is needed after seeing the patient I walk back to the OR to get those things prepared.  If the nurses cannot get an IV then it is my responsibility to place one in the preoperative area.  Sometimes this takes multiple attempts as I have to bend and lean over the patient.  In some patients it may be very difficult to insert an angiocatheter into a vein (IV) in order to administer IV fluids and medications. In this situation the case may be cancelled for special placement of a deep vein upper arm catheter with ultrasound equipment by a specialized nurse or the patient will go to the OR for central line placement by the anesthesiologist if the case is urgent or emergent.  Central line placement is a sterile procedure of placing a large Intravenous tube into a large neck vein associated with more serious risks not associated with a peripheral IV.  If IV access is acquired, I then pre-medicate the patient with a sedative and antiemetics.

3.  **TRANSPORT TO THE OR:**  I then push the bed and the patient to the OR suite usually only with one nurse guiding the foot of the bed.  There are different types of beds.  The easiest to push of the three is the gurney, the second heaviest is the ICU bed and the most difficult bed is the "bathtub" beds for the quadriplegics.  The amount of strength required to push these beds depends on the bed type, the weight of the patient, how well the wheels are functioning, how much help I have, how many IV poles, medication pumps and equipment are with the patient and how far the distance is to the OR.  I have been pushing these beds for every case up until 2010.  I have refused to push the two of the heavier beds and have especially tried to get other staff to push the heavier patients since returning to work in 2011.  However, sometimes extra assistance is not available and I must push the beds with the patients on them.

4.  **OPERATING ROOM SUITE:**  Once we arrive in the operating room, the nurse and myself then push and pull the bed to the side of the OR table and lock it.  We then move the patient from the bed to the OR table.  The difficulty and strength required to do this depends on how well the patient can move themselves, how heavy the patient is, how well the roller is working and how much help we have in the room.  Basically, I have to bend over the patient from the head, push them to their side while a roller is placed, and lift their head and shoulders as the others push the patient over to the OR table.  Once on the OR table we need to position the patient again.  Sometimes we having to lift the patient for various of reasons, such as repositioning a slipped gel pad or bean bag or move the patient further down on the OR table, etc.  I then have to lean over the patient and place the arm boards and secure their arms.  If any further movement of the patient for positioning is needed then the arm boards have to be repositioned while leaning over the patient.  Placement of the arm boards can be tricky and is really tough on the back.  I then lean over and reach across the patient to place all the monitors.  This includes 3-5 EKG pads, blood pressure cuff, pulse oximetry, and then place oxygen on the patient face with a mask.

**5. INDUCTION OF ANESTHESIA:**  I administer oxygen by mask and then most often induce anesthesia by leaning over the patient and placing medications in their IV.  The patent then stops breathing and now I must manually mask ventilate the patient.  I use the mask and usually place an oral airway and manually squeeze a re-inflatable bag to push air into the lungs of the patient.  Once I establish I can ventilate the patient and depending on the type of case, I administer a paralytic medication.  I then mask ventilate the patient for an average of 3-5 minutes to give the medication time to work before intubation (placing a tube into the trachea of the patient).  There are many issues concerning mask ventilation, difficulty and related pressure and therefore physical labor that must be applied to the bag and mask for each patient.  Commonly the most difficult patients to mask ventilate are the obese.  Many and perhaps most patients with obesity have related sleep apnea.  Sleep apnea for the general public is snoring.  For an anesthesiologist who renders a sleep apnea patient medications that stop the patient from breathing means a possible collapse of the oropharyngeal tissues.  When this happens it takes much effort and pressure to get a mask seal on the patients face and then to squeeze the bag to get air into the lungs.  Sometimes it may require two anesthesiologists to ventilate these patients.  One to hold the mask on the face and one to squeeze the bag.  To hold the mask on a patients face I have to lift forcefully on the jaw and hopefully lift the oropharyngeal tissues out of the airway so that air can be forced through and into the lungs.  Due to jaw and facial abnormalities, and most commonly obesity the force and strength to accomplish this may be incredible and extremely stressful to the back.  Remember, that I am accomplishing all this while leaning over the patient. This time of ventilation may be extremely stressful as I prepare to intubate the patient which usually is difficult also because of the patients obesity.  During this time of mask ventilation I may be leaning and reaching over the patient for extended periods of time and under extreme duress and labor.  The distance that I have to reach and extend myself over the patient varies depending on how far the patient has been positioned on the OR table before being put to sleep.  In the mean time, the anesthesiologist is frequently twisting around to see the monitors during all of this activity and twisting and reaching to obtain supplies. Other reasons for difficult mask ventilation includes: facial abnormalities, neck and facial radiation, previous jaw surgery or fractures preventing mouth opening, beards preventing mask seal on the face, facial and neck tumors, large thyroids, pneumonia, bronchitis, collapse of a lung, asthma, restrictive airway diseases, pulmonary edema, trauma to the chest and lungs and laryngospasm. Laryngospasm can happen to any patient during mask ventilation before intubation, during the operation if an LMA is used (a tube that does not go through the vocal cords) or after extubation (taking the tube out of lungs) and even in the recovery room. Laryngospasm entails vocal cord closure preventing air from entering and inflating the lungs.  Treatment for this situation is emergent high pressure continuous positive pressure. Which means I must seal the mask on the patients face as best as I can and squeeze the bag holding pressure against the vocal cords.  This activity for the anesthesiologist is not only stressful but extremely laborious and causes extreme duress physically on the back.  If this doesn't break the spasm of the vocal cords then we administer a short acting muscle relaxant and paralyze the vocal cords.  Another problem that is not that uncommon is the

asthmatic who has an asthma attack after induction (being put to sleep) or after intubation and even after extubation and in the recovery room.  It is difficult to push air into these patients because their lungs are in bronchospasm limiting the amount of oxygen you can get into the lungs.  If this happens after induction, the treatment is to force ventilate as much as you can and to intubate (place a tube into the trachea) as soon as possible and then treat with medications through that placed endotracheal tube into the lungs.  This situation also may cause prolonged and extreme duress on the back because so much force is needed to mask ventilate these patients.

6. **INTUBATION (placing a tube into the trachea):**  After ventilating the patient by mask and the patient is paralyzed or deeply anesthetized I place an endotracheal tube (tube in the trachea) or an LMA ( tube that "cups" the vocal cords but does not go through them) depending on the risk factors and the type of procedure.  The definitive airway or "gold standard" is the proper placement of an endotracheal tube. If an LMA is chosen, all the previously mentioned problems are still a risk since the vocal cords are not prevented from closing such as in the case of laryngospasm.  It happens quite frequently that an LMA may not "fit" properly and it may require multiple attempts to place and obtain an appropriate seal to work correctly.  Sometimes I cannot obtain an appropriate seal and fit with the LMA and the patient will need to be intubated with an endotracheal tube.  This requires removing the LMA and continuing to mask ventilate the patient as discussed above in between attempts.  It has happened that an LMA will be placed easily and in the middle of the procedure the patient may cough and dislodge the LMA or the patient may have laryngospasm or an asthma attack forcing the anesthesiologist to use high pressures to manually mask ventilate the patient before another tube (the gold standard endotracheal tube) can be placed.  An endotracheal tube (tube placed into the trachea) is the definitive airway.  However there may be difficulties in placement of the endotracheal tube.  Some patients have "difficult" airways.  There are factors to look for in the patient's anatomies but sometimes a difficult airway is not always obvious until I get the patient to sleep.  The most common patient with a difficult airway is the obese patient.  This patient is most commonly difficult to mask ventilate and to intubate.  The obese patient has very little oxygen reserve for keeping their oxygen saturations at a normal level and therefore not only is ventilating and intubating more difficult but I am on a time race as these patients can drop their oxygen levels to critically low levels very rapidly as indicated by a pulse oximeter.  These patients are also at a high risk of aspiration.  Aspiration occurs when the stomach's contents are regurgitated and enter the airway and lungs after the patient is asleep. The risk of aspiration increases with how long a patient is ventilated by mask, how patent the airway is, pathology of the stomach preventing emptying (diabetes, obesity, bowel obstruction, hiatal hernia, a recent meal, and emergency status) and if an endotracheal tube is improperly placed (endotracheal tube is placed into the esophagus instead of the trachea and gases are pushed into the stomach).  Other issues of the obese include thick neck causing problems with neck extension needed for intubation, smaller mouth aperture, large tongues, large breasts that impede airway management along with mask ventilation problems.  To intubate we

use a laryngoscope, which is a hand held metal rounded instrument shaped like the back of a banana. We insert this instrument directly into the mouth, extend the neck, sweep the tongue to the side and lift up in order to visualize the vocal cords. If the vocal cords are visualized I then attempt to insert a endotracheal tube between the vocal cords. Placement and lifting of the laryngoscope against the patients anatomy may be very difficult and require a lot of strength for some patients. This is another vital issue with anesthesia that is strenuous on the back muscles. The position entails bending over the patient like most other activities of the anesthesiologist. Once the endotracheal tube is placed and the balloon cuff is inflated, I check for proper positioning. I check to see the lungs rise while squeezing the bag, I feel the bag refill with lung recoil and expiration of air from the lungs, I check the monitor for end tidal $CO2$ which indicates lung gases and then I listen to the lungs with a stethoscope. Once endotracheal tube placement is checked and confirmed then the patient's endotracheal tube is secured and is attached to the ventilator tubes and the patient can now be ventilated by a machine according to parameters set by the anesthesiologist. Just like the issues with mask ventilation there are potential problems with endotracheal placement. Difficult intubation issues include: Poor neck extension, abnormal and obstructive teeth, large tongue, poor mouth aperture and jaw mobility, large thick neck in the obese, obstructive flabby oral and pharyngeal tissues, history of neck radiation and previous neck and oral surgeries, abnormal anterior airway, genetic abnormalities of the face including recessed chin, blood in the airway, regurgitation of gastric contents obstructing your view and many other reasons. Sometimes a "difficult" airway cannot be intubated at all, even with special equipment such as the glide scope and direct fiberoptic intubating equipment. Remember, while we are attempting to place the endotracheal tube, we have to continue to mask ventilate the patient or sometimes we temporarily place an LMA in between attempts. Not only is this situation stressful it is extremely laborious, especially on the lower back and the event can be very prolonged with leaning and reaching over the patient during these activities. I have had patients where even with multiple anesthesiologists we were not able to intubate the patient with an endotracheal tube after hours of attempts. We then have to mask ventilate the patient until an airway is established or we wake up the patient and get them to breathe on their own. There is always the concern of laryngospasm, aspiration, dental trauma, asthma attack, and blood in the airway from the trauma of attempting to place the endotracheal tube. The worst scenario is the loss of the airway! "Loss of airway" means you cannot ventilate and you cannot intubate the patient and now the situation is dire. This situation can occur at anytime even if you were able to mask ventilate earlier in the case does not mean that you can maintain it. It is at this point that a surgeon must be called emergently, if not already present, to surgically open the trachea with a scalpel through the neck and insert a breathing tube to prevent death of the patient (tracheostomy). The number one cause of death under anesthesia is due to issues with the airway. This is the most important and critical time during an anesthetic. Hence, why I have spent so much time explaining things in detail.

**7. PREPARATION OF THE PATIENT FOR SURGERY:** After the airway is secured and patient is placed on the ventilator or an LMA is placed, we then have to reposition the patient.  Sometimes a patient is positioned high on the OR table for difficult airway anticipation and now needs to be moved into a better position or lithotomy (legs in stirrups) position for surgery.  If the surgeon comes in and decides he wants different positional equipment, such as a bean bag under the patient to maintain proper patient position for surgery, or a different OR table then we have to pull and push the gurney back into the room, position by the OR table and lift and roll the patient back onto the gurney and fix the OR table.  The patient is then lifted and rolled and repositioned again onto the OR table.  Sometimes we need to pad and tuck the arms to the sides of the patients which requires bending over and lifting weight and squatting. It is at this time that I am bending over the patient placing IV's , possibly an arterial line and a central line (which may take up to an hour).  I continue to bend over reaching and giving medications IV throughout the entire case.  I may need to replace dysfunctional monitors, place a tube into the nose or mouth that goes into the stomach, place an esophageal temperature monitor, hook up blood tubing, place a warming device on the patient, change IV bags of fluids out, place face protective cushions, and obtain and maintain additional equipment.  All patient care requires leaning over, reaching, bending, squatting, pushing and pulling and lifting.  It is now time to reposition the OR table with the sleeping patient on it to where the surgeon wants the bed in the OR.  For example, hand surgeons and kidney doctors usually want the OR table turned sideways, ear surgeons want the OR table turned 180 degrees, and robotic cases require the bed to be moved to all different positions and locations in the OR depending on the procedure, the surgeon, and his preferences and the room size.  The OR table is about 800 to 1000 pounds and has wheels that lock.  When a patient is placed on the table the weight increases and varies with the weight of that patient.  The amount of strength to move an OR table depends on the weight of the patient, how well the wheels are working, how many defects are in the flooring, and how much help I have.  About 50-60 percent of my cases require moving the OR table.  Once the OR table is positioned to the surgeons liking then I must rearrange all of my equipment to fit the scenario.  I need to move the anesthesia machine with the ventilator, the anesthesia cart with all my supplies, move the monitors, IV poles, squat to the floor and sometimes crawl and bend over to move wires and cords, retrieve the foley, move the computer table, move overhead surgical lights, plug and unplug equipment both overhead and on the floor, redo disconnected monitors on the patient, etc.

**8. MAINTENANCE OF THE ANESTHETIC:** I now am responsible to maintain the anesthetic for the surgeon to complete the procedure.  I must constantly listen to hear the monitor beeps and warning bells, and to the monitors indicating heart rhythm and oxygen saturations which have descending pitch sounds with desaturations as a warning.  I also am constantly monitoring the patients breathing patterns regardless if on the ventilator or not.  I continue to bend over, reach and sometimes squat to give IV medication throughout the case as required.  I walk around the room to ensure the safety of the patient throughout the case and to

monitor the patient's positioning as with the robotic cases the patient may slip or move as the case proceeds. I also monitor what is going on in the room and watch for blood loss and inform the surgeons of my concerns. I maintain and deal with any airway issues that occur such as kinked tube, ventilator issues, suctioning out the endotracheal tube of secretions, changing the ventilator setting depending on the changing circumstances of the OR. I am continually watching and listening to the monitors and adjusting them as needed, changing out the IVF's, which encompasses reaching up and taking down and replacing 1 liter to three liter bags of fluids (usually the 3 liter bags require the nurse and then I help her), hanging blood or blood products, adjusting the anesthetic gases, checking for the urine output in the foley (urine collection device that has a tube into the patients bladder) on the floor and giving blood transfusions, checking blood sugars and hemoglobin and blood gases as needed. Sometimes another IV or line is determined to be needed after the case has started and I must crawl and get under the drapes and lean, bend and reach in to put in these lines in difficult positions. Anesthesiologists must always be ready for any emergency and is always looking for possible problems. Some patients have dangerously low blood pressures that require medications, fluids and possibly blood while some have life threatening high blood pressure that must be treated urgently. Some patients have cardiac problems such as having a heart attack or have abnormal rhythms that require urgent treatment. Some patients have strokes and pulmonary, air or fat embolisms which are life threatening as well.

9. **ELECTRONIC RECORDS AND ANESTHESIA RECORD:** Once the patient is stable and surgery is proceeding and all problems have been checked and resolved, I now computer chart and look up any labs or information that I have been waiting for. I have to document my pre-op visit and all the patient history if not done in the preoperative area. I then must document the antibiotics and times and place all the orders for the patient that they will need in the recovery room or the ICU after the case. I also document all anesthetic information on a paper record that will be maintained in the chart as well.

10. **EMERGENCE FROM ANESTHESIA:** Once the procedure is completed it is time to wake the patient up. This is done by reversing the muscle paralytic medications and the process of weening down the anesthetic gasses, and working on getting the patient to breath on their own before the endotracheal tube is removed. It is also the time that the foley must be emptied requiring squatting or kneeling to get to it on the floor. We disconnect blood tubing and throw away and pack up the cords to some of our equipment. We take off the warming device and wrap up that cord and push to the side. I push other equipment back away from the patient, like the bovie (cauterization) and cystoscopy towers, suction machines, video equipment and screens. The OR table needs to be moved back into neutral position in the room along with repositioning the anesthesia machine, the anesthesia cart, and the IV poles. I take off the facial protective padding and unwrap the arms and place on repositioned arm boards. I then help clean and redress the patient in clean gown and blankets. If the patient is on their side for the procedure or is prone (face

down), the patient needs to lifted and moved to a supine position for wakeup.
Getting the patient to a place where they are breathing on their own and can be
extubated (tube removed) can sometimes be difficult especially in the obese. Some
patients will not breathe but will cough with such force that we have to stop the
ventilator and try to squeeze the bag to get air into the patient's lungs. If the patient
is not forced ventilated then the patient will desaturate (oxygen levels will drop
critically low rapidly), start to turn blue and then will begin to have bradycardia
(slowing of the heart rate), which can then become a "code" situation. The treatment
may be to give another paralytic agent but then we may be in the same situation
again after it wears off. Most commonly we force bag ventilate the patient in
between the coughs and continue this until they stop coughing and then we try to let
them breathe on their own. This cycle may be repeated multiple of times as the
patient wakes up. As I informed you earlier, this activity is stressful, requires a lot of
strength as we are bending over the patient and squeezing the bag with all our
strength. This situation can occur with any patient but is most common in the obese.
Once the patient is breathing on their own in an appropriate pattern and tidal volume
and the patient is determined to be awake enough, the endotracheal tube is taken
out. I place a transport face mask for oxygen on the patient after I ensure that the
patient is continuing to breathe on their own. It is at this point that the patient may
start having larygospasm, as already discussed. The patient may fail extubation,
which means not breathe well enough to keep their oxygen levels to normal level and
may need to be re-intubated again! The patient may vomit, cough and aspirate
(gastric contents enter the lungs), the patient may be too weak and not able to
continue to breathe on their own without support and may need reintubation. The
patient may start to have an asthma attack requiring reintubation. I must also
mention that some patients wake up agitated and confused and the patient may
need to be restrained in order to prevent the patient from falling off the bed or from
injuring personal, myself or themselves. Sometimes this takes a lot of strength and
effort and when these situations arise, I have to guard the patients airway (make
sure that the patient is still able to breathe) and hold them down until more help,
preferably some large staff members, come in to help if we are lucky to have them
available.

**11. PREPARING TO LEAVE THE OR:** Once the patient is determined to be
breathing fine and is extubated we then move the patient again from the OR table
back onto the transport gurney. The patient is positioned siting up which requires the
anesthesiologist to go behind the head of the bed and squeeze a lever and push up
against the weight of the patient. This activity alone has caused many episodes of
back pain, especially with the obese patient. The anesthesiologist determines if any
monitors are needed for transport and are placed back on the patient for transport. I
then pull the gurney with the patient on it out of the room with a nurse at the foot of
the bed guiding. As the room is exited, the bed is swung around so that the
anesthesiologist is in a position to push the patient to the recovery room area, the
distance which varies from facility to facility. If the patient is to remain on the
ventilator, then the patient is either taken to the recovery room where a ventilator will
be set up or is taken directly to the ICU. If a patient is to go directly to the ICU, then

an ICU bed is required (which is much heavier) and more monitors are needed on the bed for transport. The anesthesiologist is expected to push all this weight and to manually bag ventilate the patient, while continuing all monitoring and handling of any issues and medications. The distance to the ICU is usually far on the other side of the hospital and many times on an entirely different floor. This requires long distance, pushing, pulling and bending over the patient bag ventilating and maneuvering in and out of the elevators and down long corridors. Sometimes getting the patient into their specific ICU room is a tricky feat with lots of maneuvering into the small space. Sometimes I have to turn the bed and back in and sometimes we have to go head first depending where the ventilator machine is set up. It is then that the transport monitors are taken off and the ICU monitors are placed. The patient is hand ventilated until respiratory technicians ready the ventilator. I may be giving the patient medications in their IV throughout this entire process for various reasons. I then ensure patient stability, give orders, report to the receiving nurse, finish paper and computer charting before heading back to the surgical area on the other side of the hospital.

12. **RECOVERY ROOM:** If the patient is extubated and transported to the recovery room, the monitors are placed again, records are completed, full report is given to the nurses and all issues are solved before leaving. Any issues may occur in the recovery area that occur in the operating room, most commonly and serious are respiratory issues as already discussed. Sometimes due to patient movement the patient must be lifted and moved multiple times to a better position to aid breathing. Problems such as layngospasm, asthma attack, respiratory depression, respiratory failure requiring reintubation with all possible problems already discussed, cardiac problems such as heart attack, low blood pressure, high blood pressure, pain issues, blood sugar management, pulmonary issues such as edema, aspiration, pneumonia and lung collapse, bleeding issues, and the determination if the patient needs to reenter the operating room for exploration and further surgery. If it is determined that the patient needs to go back to surgery then the entire process is repeated. If the patient is stable and all problems have been resolved, electronic medical charting, orders and paper charting is completed and any required discussion with the patient is done. It is then, that the anesthesiologist leaves the recovery area to start the entire process over again with the next patient. However, the anesthesiologist knows that the recovery period can always produce further problems that require a return to the recovery area or we may be called by the nurses for further medications, treatments, tests, or consultations. It must also be mentioned that while in the recovery room we are expected to help the nurses if they are having emergency medical issues with any patient regardless who the original anesthesiologist is. We assist and give emergency care until the appropriate physicians arrive and can take over and the patient is stabilized.



Claimant Name: Dawn J McGinnis          Claim #:   11107633

**PHYSICAL REQUIREMENTS OF THE ANESTHESIOLOGISTS:**

1. **CLIMBING:** Climbing stairs to and from the OR and to other sections of the hospital in between cases and to and from different facilities where we practice. Rarely we need to use a step to help manage an airway or get to a patient when the OR table is up high for surgery. (occasionally)

2. **BENDING/STOOPING:** Almost all activities related to providing anesthesia require bending over the patient for direct care from the beginning to the end. See " Daily Activities and Duties of an Anesthesiologist" addendum. Placing a central line (finding and inserting a catheter into a large neck or chest vein) may be required to be inserted before or during a surgical procedure. Placing a central line requires the anesthesiologist to wear a sterile gown and gloves and to work within a small sterile field in a bent over position for prolonged periods of time. (very frequently)

3. **KNEELING:** Retrieval of the foley and emptying, movement of monitors and wires and plugs in the way of OR table movement, plugging and unplugging equipment, wiping up water and blood off floor, picking up dropped items, finding lost needles or tools from surgery, checking patient positioning, placing IV or line after surgery has started, tucking in arms to the sides, tucking and securing blankets, etc. (occasionally)

4. **SQUATTING/CROUCHING:** See above and below

5. **CRAWLING:** Usually rarely needed to find a lost surgical needle or a dropped drug vial, to get under the drapes to get to the patient after surgery is started, to free a cord in the way of OR table movement. (rarely)

6. **REACHING:** Most of what we do requires reaching as we are bending over and leaning forward to administer medications, manage the airway, intubation, patient warmer placement, line placement, monitors and ventilator use, etc. Reaching ABOVE our head includes activities such as OR light movement (these light are about 3-4 foot in diameter) and positioning for the surgeon, management of the monitors that are higher up (see picture of the anesthesia machine), hanging IV bags of fluids, blood and blood products, IV poles, etc. Please see "activities and duties of the anesthesiologist" addendum. (frequently to constantly)

7. **WALKING:** We walk from the parking garage to the facility to the OR, to the preoperative area, to the OR, around the OR and then to the recovery area, back to the OR to set up for the next patient. Depending on the schedule then we may leave the facility to drive and go to the another facility or hospital or may need to walk to a

different portion of the hospital to a different department (where the same process of walking to the facility, the dressing area, the OR, to preoperative area, to the OR, to recovery and back again)  Some days we stay at one facility doing multiple cases other days we are scheduled to go to multiple facilities and departments and then back again.  Our schedule usually varies from one case to the maximum cases I completed in a 24 hour period was 26 cases.  Our usual day in the last few years has been 2 longer 5 hour cases to 7 shorter cases in different facilities and departments. Everyday the schedule varies depending on the number of cases that require coverage and whether one is on call or late stay. (frequently to constantly)

8.  **LIFTING:**  We lift patients, position patients, lift their body parts, lift monitors and equipment, lift drug trays, lift IV fluid bags, lift the IV poles with the IV fluids hanging on them, lift some monitors as needed. See "activities and duties of an anesthesiologist" addendum. (frequently)

9.  **SITTING:**  Only in the longer cases with stable patients do we get a chance to sit down in a chair once surgery begins.  However, we must always be ready to spring up to action. Some days we do not get a chance to sit at all if they are short cases and the turnover is rapid such as in the outpatient surgery. (rarely)

10.  **PUSHING/PULLING:**  Please see "activities and duties of an anesthesiologist" addendum.  As noted we push and pull the patients from the beginning to the end of the case.  We push and pull equipment, anesthesia machine, the monitors, equipment, the OR table, IV poles, etc. (frequently)

11.  **HAND USE:**  Everything in anesthesia requires hand use. Fine grasping of the needles and small vials of medications, to IV and line placement, to monitor use, programming of monitors and the ventilator settings, to computer use and charting. (constantly)

12.  **FOOT CONTROLS:**  This activity is rarely required now but was necessary when we had the older OR tables which had foot petals to lock and unlock the table and we had to use the foot pumping action to raise and push down to lower the table. We still have foot brakes and releases on all the gurneys and ICU beds and the anesthesia machine, anesthesia cart and the computer table. (Rarely)

13.  **TWISTING:**  This is a frequent action that is necessary mainly for turning to look at the monitors showing vital signs and the patient's heart rhythm and rate while directly doing a procedure on the patient.  Unfortunately, the monitors are behind us when we face the patient. See "activities and duties of an anesthesiologist" addendum.  It is most vital during induction, mask ventilation, intubation and during central line placement. (frequently to constantly)

## WORKING ENVIRONMENTAL CONDITIONS FOR THE
## ANESTHESIOLOGIST

1.  **HEAT:**  Not an issue usually.

2.  **COLD:**  The operating room is on the average 60-65 degrees continuously. (constantly)

3.  **DUST, FUMES, GASES:**  We are exposed to anesthetic gases, especially with mask ventilation and pediatric mask inductions.  We are also exposed to gases/ fumes/smoke from the cauterization device that burns and cuts flesh during surgery. The laser device also gives off fumes/smoke and we need to wear special masks around our face and nose to decrease the risk of infection from viruses that are aerated. (frequently)

4.  **WETNESS:**  Depends on the type of procedure being done.  It is common for saline fluids contaminated with blood to run onto the floor causing some flooding during arthroscopy cases.  This includes scopes of the knee and shoulder.  Urology scope cases can also cause flooding onto the floors.  Many procedures cause blood to run off the OR table onto the floor. (occasionally)

5.  **VIBRATIONS:**  Vibrations are common with orthopedic (bone) procedures that use electric saws and manual hammers. (occasionally)

6.  **NOISE INTENSITY:**  I try to keep the level of noise down so I can hear my monitors beeping and the warning bells.   Some surgeons play music during the procedure at various intensities.  The bone saws and hammers are pretty loud but are usually used in short intervals.  (moderate)

## EVOLUTION AND PROGRESSION OF MY SYMPTOMS
## OF SPINAL STENOSIS:

The practice of anesthesiology requires repetitive duties of high intensity of lifting, pushing, pulling, leaning over the patient, bending, reaching, and twisting. All of these activities are constantly exacerbating the symptoms of my condition of spinal stenosis.

To clarify the pain involved in my condition, I have constant neurologic symptoms in my lower back, buttocks, legs and feet.  This pain is nerve pain and is mainly burning, some numb feeling, painful skin, heavy feeling legs and painful/burning feet. These symptoms intensify when I have a long day on my feet with minimal time to sit and rest.  They also intensify when I sit more than 20-30 minutes in a chair.  These symptoms have leveled out to about 20% of the intensity that I experienced in 2010.  These symptoms are permanent and cannot be reversed.  Since last seeing Dr. Maric, I can now feel pressure pushing on the left side of my spine and I have noticed that my left heel has become numb. This new symptom seems to be lessening now over the last few weeks.

The second type of pain I have is pain in the lumbar area (lower back).  This pain varies day to day depending on my activities. Many days I wear a back support when the pain is more intense. While at work this pain is constant since I am repeatedly irritating my back with the regular movements required by my profession as an anesthesiologist. Some days it is worse than other days depending on the weight of the patients, the difficulties encountered, and how hard I worked or injured my back the previous day (see "activities and duties of an anesthesiologist" addendum).  Some days it is unbearable and I must find someone to take over my case load.  Some days I can barely walk as it pushes me forward and I cannot stand up straight.  There have been many days in which I was not sure if I could make it through a case because I felt the signs of muscle spasm beginning.  This type of pain can rapidly progress to the third type of pain, discussed below.

The third type of pain is extremely painful and completely debilitating back spasm pain. When my back muscles spasm (as a result of overuse and strain) I can collapse and go into a situation of muscle "lock down".  This means that the back muscles all spasm at the same time because they are very irritated and it can cause one to collapse to the floor and remain immobile for extended periods of time.  When this happens I am completely incapacitated and cannot move, stand or walk.  I have to wait until the spasm starts to release which varies from 1 hour to many hours but usually will release if a muscle relaxant is taken (Valium) and motion is restricted.  If this situation happens then it may take weeks to months to recuperate. If I start moving too much then the whole process of spasm will start again.  This muscle spasm is the bodies protective mechanism of preventing you from further injury.  I have been in a case with such severe back pain that I had to call in a colleague to take over the rest of my cases and it took me over an hour to get to my car.  I could barely walk or move from the spasm and pain ( I had to walk slowly, hunched over with frequent rests after only a few steps and

then I had to frequently squat to rest the muscles as well).  If I had gone into total "lock down" then I would have been completely incapacitated and unable to get up and move at all.  I have been on call and after doing a full day of cases I was in such intense pain, I knew that the spasm of my back would start if I did another case.  My office then called me to do a 5 hour case as an add-on to my schedule and I could not do the case for fear I would not be able to safely administer anesthesia.  I had to call a colleague anesthesiologist from another group in to cover the case as no one in my loosely affiliated group would cover the case for me.  I have had to call in a trauma anesthesiologist in for backup many times to be sure I could ventilate and intubate a patient due to my back pain.  I was not sure I would collapse on the floor at the most critical time.  Just a few weeks ago before June15th, I had an airway crisis with an obese patient who started coughing and I had a very hard time ventilating and intubating him, all the while my back was hurting and was beginning to spasm from the strain.  I called for backup help and I was lucky another anesthesiologist was nearby because I was in an ancillary area of the hospital in the lithotripsy unit and many times you are there by yourself.  I got the patient through the case and when it was over I had a hard time walking to the next set of cases scheduled and I was in severe pain for the rest of the day and week.  I have lost many days from work due to my back issues, and I lost almost a year of work from the episode in 2010.  My job requires administration of anesthesia in other areas of the hospital in which you are the only anesthesiologist and there is no backup at all, such as in the department of radiology/special procedures and radiation/oncology.

In this last year, my symptoms have worsened, the more intense episodes are becoming more frequent, more painful, more debilitating and more difficult to recuperate from.  They have also have become completely unpredictable.  The last day I worked, I had a long day of cases, went home and went to bed sore.  I woke up the next morning in complete "lock down" in muscle spasm.  I could not get out of bed and had to call my scheduler to find coverage for all of my cases.  I have not returned to work since that last day June 15, 2015.

As an anesthesiologist I have a duty to provide safe anesthesia to all of my patients under emergent, critical, laborious and stressful situations as I have described.  I have now come to the point where I am no longer able to provide predictable, safe and reliable care to the patients due to my condition and If I continued to practice anesthesiology I would be putting my patients at risk for severe complications, injury and possibly death.  I cannot continue to practice with these risks as it in unacceptable to both my patients and myself.

# CURRICULUM VITAE

## DAWN J. MCGINNIS, M.D.

9627

**EMPLOYMENT:**
Park Central Anesthesiologists, LTD.
300 W Claredon Ave suite #142
Phoenix, AZ 85013
PHONE        1803        FAX        3748

**PERSONAL DATA:**
Date of Birth:        65
Place of Birth:
Citizenship:  United State of America

**EDUCATION:**
Undergraduate: **Oral Robert University**, Tulsa, Oklahoma
Bachelor of Science – Biology 1987

Graduate:        **University of Oklahoma, College of Medicine**
Oklahoma City, Oklahoma
M.D. 1994

Post Graduate:  **University of Arizona**
Integrated Residency of Anesthesiology
Maricopa Medical Center
Phoenix, AZ
Internal Medicine Internship        1994-95
Anesthesiology Residency 1995-98

**CERTIFICATIONS:**
Diplomat of the American Board of Anesthesiology 1999
Arizona Medical License
ACLS & BLS Certified

**PROFESSIONAL ORGANIZATIONS:**
American Society of Anesthesiologists
Arizona Society of Anesthesiologists

**REFERENCES:**
Furnished upon request.

June 30th, 2015


PCA Anesthesia and Anesthesia services
300 W Claredon Ave Ste #142
Phoenix, Az. 85013
(602)-234-1803


Dear PCA anesthesia  and Anesthesia Services,


As many of you know, I suffer from significant and ongoing back problems and simply cannot continue the practice of anesthesiology safely for myself or my patients.  After much deliberation, I have decided that I will be withdrawing from the group practice and from practicing anesthesia on a permanent basis.  The last day I worked was on June 15, 2015.

For those of my partners who have been so helpful in providing me assistance with patient care, help in covering cases in urgent times, covering my call obligations and taking care of my request cases at last minute notice,  I thank you.

For the office, please send my mail to my home address along with billing fee notices, and deposit slips.  Please feel free to contact me for further issues about account receivables, credentialing withdrawal, patient, professional, billing and hospital issues (lockers, scrub return, badge returns, medical records, etc.)  I will continue to be available to you.  I appreciate all the exceptional service and hard work all these years!


If there is any further requirements with respect to withdrawing from PCA, please contact me.

I wish everyone the best.


Sincerely,

Dawn J. McGinnis MD

---

*Claimant Name: Dawn J McGinnis        Claim #:  11107633*

```
                              Letter Detail
-------------------------------------------------------------------------------

Checked/Unchecked Indicator: No

NaviLink Claim No.: 11107633

Name:  Intake Acknowledgement

Status: Final

Date: 2015-07-13

Notes: Ack Ltr-AP Mailed

Signoff By:

Signoff Status:

------------- Deliveries ---------------
To/CC/MCC: To       Addressee Name: Mc Ginnis, Dawn J
Relationship: Claimant       Document ID: 2015071316570793FAD3
Delivery Date: 07/13/2015 18:25:49
Delivery Status: Mail: Sent from Central Print
```

*Claimant Name: Dawn J McGinnis      Claim #:  11107633*

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



July 13, 2015

DAWN J MC GINNIS MD
3007 E SQUAW PEAK CIRCLE
PHOENIX, AZ 85016

RE:   Mc Ginnis, Dawn J            DOB: .         1965
      Claim Number(s):             01-02670589-002
      The Paul Revere Life Insurance Company

Dear Dr. Mc Ginnis:

Thank you for providing the following documents in connection with your claim for Individual
Disability benefits:

- Individual Statement
- Authorization
- Occupational Description

Additional information is needed in order to begin our review.  Please complete and return the
enclosed forms:

- Attending Physician's Statement – please ask your physician to complete

Please fax this information to 1-866-562-4794 by August 27, 2015.  Privacy is important to
everyone; please be sure you are faxing it to 1-866-562-4794 to eliminate the potential for
misdirected information.  If the information cannot be faxed, please mail the information to the
address provided at the top of the page.

If you have already sent this information to us, please contact us to confirm that we have
received it.

1242-03       UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

*Claimant Name: Dawn J McGinnis      Claim #: 11107633*

Dr. Mc Ginnis, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. Our experienced representatives have access to your claim documentation and will be able to assist you. We will identify your claim by your Social Security number or claim number, please have one of these numbers available when you call.

Thank you for your time and cooperation.

Sincerely,

*Pam Edmonds*

Pam Edmonds
Intake Specialist

Enclosures:      Individual Disability Claim Form-APS (CL-1020-APS)

```
                              Document Detail
---------------------------------------------------------------------------
Checked/Unchecked Indicator: Yes

Document ID: 2015071718300152246E

Entry Date: 07/17/2015 18:30:03

Received Date: 07/17/2015

Date Added to Claim: 07/17/2015

Primary Doc Type: Claim Form

Secondary Doc Type: Attending Physician Statement

Medical Provider:

Document Notes: APS 07/14/15

Work Notes:
```

*Claimant Name: Dawn J McGinnis      Claim #:  11107633*

# unum

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
P.O. Box 100262, Columbia, SC 29202-3262
Toll free: 1-888-226-7959   Fax: 1-866-562-4794
Toll free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

## ATTENDING PHYSICIAN STATEMENT (PLEASE PRINT)

**PART I: TO BE COMPLETED BY PATIENT**

Name of Patient (Last Name, Suffix, First Name, MI)

| M | C | G | I | N | N | S | | D | A | W | N | | J | | | | | | |

Social Security Number: 2 6 7 5

Date of Birth (mm/dd/yy): 65   Home Telephone Number: 1 2 6 2   Cell: -9627

**PART II: TO BE COMPLETED BY PHYSICIAN OR TREATING PROVIDER**

Instructions: Please complete, sign and date this form. The purpose of this form is to assist us in making a disability determination. Please complete all questions on this form and provide copies of supporting reports, such as office notes, medical records, medication logs, consultations and/or testing. Be sure to sign and date this form in Section F.

**A. Complete this section for normal pregnancy, then go to section C**

| Expected Delivery Date (mm/dd/yy): | Actual Delivery Date (mm/dd/yy): | Delivery Type: ☐ Vaginal ☐ C-Section | Date First Unable to Work (mm/dd/yy): | Date Hospitalized (mm/dd/yy): |
|---|---|---|---|---|
| Diagnosis Code: | ICD Code: | Height: | Weight: | Blood Pressure: |

**B. Complete this section for all conditions except normal pregnancy**

| Date of first visit for this current condition(s) (mm/dd/yy): | Date of last office visit (mm/dd/yy): | Date of next office visit (mm/dd/yy): | Did you advise your patient to stop working? ☐ Yes ☐ No If yes, effective when? (mm/dd/yy): |
|---|---|---|---|
| | | | 6 23 15 |

Has the patient had a similar condition in the past? ☐ Yes ☒ No ☐ Unknown

If yes, please provide treatment dates (mm/dd/yy): From _____ Through _____

Is the patient's condition work related? ☐ Yes ☒ No ☐ Unknown   Patient's Height: 5'3"   Patient's Weight: 110#

Is the patient's condition due to a sickness or accident?   Sickness ☒ Yes ☐ No   Accident ☐ Yes ☒ No

What is the primary diagnosis that may impact your patient's functional capacity?

Spinal stenosis 4-5

Please include primary ICD Code or DSM-IV Multi-Axial diagnoses codes          ICD Code:

| DSM-IV: I | II | III | IV | V |
|---|---|---|---|---|
| | | | | |

What are the other diagnoses that may impact your patient's functional capacity? ☒ NA

| Secondary Diagnosis: | ICD Code: |
|---|---|
| Secondary Diagnosis: | ICD Code: |

Has the patient been hospitalized? ☐ Yes ☒ No   If yes, date hospitalized (mm/dd/yy): _____ through (mm/dd/yy): _____

Was surgery performed? ☐ Yes ☒ No   If yes, what procedure was performed? _____   CPT Code: _____   Date Surgery Performed (mm/dd/yy): _____

CL-1020 (06/13)                                    12

# UNUM

**INDIVIDUAL DISABILITY CLAIM FORM**
The Benefits Center
PO Box 100262, Columbia, SC 29202-3262
Toll-free: 1-888-226-7959   Fax: 1-866-562-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

## ATTENDING PHYSICIAN STATEMENT (Continued)

Patient's Name

| M | C | G | I | N | N | I | S | | D | A | W | N | | J | | | | | | | |

Date of Birth (mm/dd/yy)   6 5

### C. Functional Capacity

If your patient does *not* have physical and/or behavioral health RESTRICTIONS (activities patient should not do) and/or LIMITATIONS (activities patient cannot do), please initial here _____ and go to *SECTION D.*

Please note: When considering a standard 8 hour workday with breaks (approximately every two hours) please quantify terms that may not be uniformly understood such as "prolonged", "repetitive", "light-duty", "heavy lifting", or "stressful situations". In addition, never means not at all, occasional means more than never but less than 33% of the time, frequent means 34-66% of the time, and constant means 67-100% of the time.

**Physical Restrictions**

If your patient has CURRENT PHYSICAL RESTRICTIONS (activities patient should not do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

she is not able to stand for > 30 min at a time.
she cannot lean forward for any significant period of time
_____ bend or lift 710 #

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____   To (mm/dd/yy): _____

**Physical Limitations**

If your patient has CURRENT PHYSICAL LIMITATIONS (activities patient cannot do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

see above

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____   To (mm/dd/yy): _____

**Behavioral Health Restrictions**

If your patient has CURRENT BEHAVIORAL HEALTH RESTRICTIONS (activities patient should not do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

N/A

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____   To (mm/dd/yy): _____

**Behavioral Health Limitations**

If your patient has CURRENT BEHAVIORAL HEALTH LIMITATIONS (activities patient cannot do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

N/A

Please provide the duration of these restrictions and limitations. From (mm/dd/yy): _____   To (mm/dd/yy): _____

CL-1020 (06/13)                                          13

**INDIVIDUAL DISABILITY CLAIM FORM**
Benefits Center
PO Box 100262, Columbia, SC 29202-3262
Toll Free 1-888-226-7959   Fax 1-866-662-4794
Call toll-free Monday through Friday, 8 a.m. to 8 p.m. (Eastern Time).

## ATTENDING PHYSICIAN STATEMENT (Continued)

**Patient's Name**

| M | C | G | I | N | N | I | S | | D | A | W | N | | J | | | | | |

**Date of Birth (mm/dd/yy)**   6 5

**What diagnostic or clinical findings support your patient's restrictions and/or limitations as noted above?**

MRI shows spinal stenosis at 4-5

**What is your treatment plan? Please include all medications.**

she can live with the pain or have surgery

**D. Prognosis**

Do you expect improvement in the patient's functional abilities?   ☐ Yes   ☒ No

If yes, when do you expect improvement (mm/dd/yy)?

**E. Other Treating Physicians, Facilities, Hospitals or Recent Referrals**

Please provide the name, contact information and specialty of any other treating physicians, facilities or hospitals.

| | Specialty | Address |
|---|---|---|
| | | |
| | | |
| | | |

**FRAUD NOTICE:** Any person who knowingly files a statement of claim containing false or misleading information is subject to criminal and civil penalties. This includes Attending Physician portions of the claim form.

**F. Signature of Attending Physician**

The above statements are true and complete to the best of my knowledge and belief.

Physician Name (Last Name, First Name, MI, Suffix) Please Print

Zorba Marc, MD

**Medical Specialty**   orthopedic spine          **Degree**

**Address**   333 W Thomas Rd #202

**City**   Phoenix          **State** AZ   **Zip** 85013

**Telephone Number**   602 274 0400   **Fax Number** 602 274 2871   **Physician's Tax ID Number:** 6085

Are you related to this patient?   ☐ Yes   ☒ No
If yes, what is the relationship?

**Signature of Physician**          **Date** 7/14/15

CL-1020 (06/13)                    14

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNUM GROUP,
　　Plaintiff

　　V.

TIMOTHY P. LOFTUS,
　　Defendant

CIVIL ACTION NO. 16-40154

**COMPLAINT**

Plaintiff, Unum Group ("Unum") hereby states as follows:

**PARTIES**

1.　　Unum is a Delaware corporation registered as a foreign corporation in

Massachusetts.  Unum's principal place of business in Massachusetts is located at 1 Mercantile

Street, Worcester, MA 01608.

2.　　Defendant is a citizen of Massachusetts who resides at 23 Greany Drive, Grafton,

MA 01536.

**JURISDICTION AND VENUE**

3.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

Unum has asserted a claim for misappropriation of trade secrets under the Defend Trade Secrets

Act against Defendant.  This Court has supplemental or pendant jurisdiction over Unum's

remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Unum's

federal misappropriation of trade secrets claim that they form part of the same case or

controversy under Article III of the United States Constitution.

4.　　Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) because

Defendant is a resident of Massachusetts.  Venue is also appropriate in this judicial district under

28 U.S.C. § 1391(b)(2) because the events that gave rise to this complaint occurred in this district.

FACTS

### A.   Unum's Business

5.      Unum is a leading provider of disability benefits in the United States.  In addition, Unum is a leading provider of a variety of other financial protection benefits, including voluntary benefits, whole and universal life insurance, critical illness benefits, accident coverage, and dental benefits.

6.      As the leading provider of financial protection benefits to thousands of customers, Unum has access to confidential information regarding its customers, policyholders, applicants for insurance coverage, and parties with whom it does business ("Confidential Customer Information").

7.      The market for financial protection benefits is highly competitive. There are a multitude of other companies, each offering their own financial protection benefits, competing for the same customers and market share that Unum services.

8.      Unum's success is dependent on its ability to protect its customers' confidential information, as well as its own confidential, proprietary, and trade secret information.

9.      Unum's confidential, proprietary, and trade secret information includes, but is not limited to, its financial, business, technical, and economic information; the names of any of its customers; products; claims practices; pending litigation or litigation strategies; reserves; services; research; data bases; computer software; business or marketing plans; intellectual property; the prices it obtains or has obtained or at which it sells or has sold its products; medical and other private information about people or companies with whom Unum does business,

including insureds, customers, employees, producers, and suppliers; information that is provided

to Unum on the condition that it is kept confidential, such as licensed computer software plans;

and any other information of, about, or concerning the business of Unum, its manner of

operation, strategic direction, and/or its plans (collectively, "Trade Secret Information").

      10.    The value of Unum's Trade Secret Information is in its exclusive use by Unum

and its employees.

      **B.**    **Unum's Steps to Maintain Confidential Nature of Its Information**

      11.    Unum relies on a combination of copyright, trademark, and trade secret laws, as

well as confidentiality agreements and confidentiality policies to establish and protect its Trade

Secret Information and Confidential Customer Information.

      12.    Unum's Confidentiality/Non-Disclosure Policy provides, in relevant part, that

employees may not use Unum's confidential information to disadvantage the company and that

Unum can discipline employees who fail to respect the confidential nature of information. See

Exhibit A.

      13.    Unum's Code of Conduct provides, in relevant part, that employees must

"[a]lways manage personal data responsibly and in compliance with privacy laws and our

company policies," and that they may "[n]ever disclose any private, sensitive, secret or

confidential information outside of the company . . ." See Exhibit B.

      14.    Unum reminds its employees of the confidential nature of the Trade Secret

Information and Confidential Customer Information by requiring them to review and attest to

their review of Unum's Code of Conduct each year.

15.     In addition, Unum requires employees to attend an annual Privacy & Information

Security Training session, which details employees' responsibilities to maintain the

confidentiality of Trade Secret Information and Confidential Customer Information.

16.     In addition to the protective measures described above, Unum restricts access to

its Trade Secret Information, Confidential Customer Information, and Confidential Employee

Information by, for example, requiring encryption of external devices (such as flashdrives),

utilizing software to monitor when/how Confidential Customer Information is sent outside of

Unum, requiring employees to encrypt Confidential Customer Information before it is sent to a

third party.

**C.      Defendant's Employment with Unum**

17.     Defendant was hired by Unum on September 9, 1985.

18.     As a condition of his employment, on October 10, 1988, Defendant executed a

Confidentiality Agreement, which provides, in relevant part:

> a.  You will keep in strictest confidence all information identified
> as confidential . . . relating in any way to the business and affairs
> of [Unum] which you may acquire in connection with or as a result
> of your employment . . .
>
> c.  You will not, except as may be required by your employment
> with [Unum], duplicate, disclose or reveal to anyone such
> information without the prior written consent of [Unum]; . . .

See Exhibit C.

19.     In or around, December 2004 Defendant was promoted to Director of Individual

Disability Insurance ("IDI") Benefits.

20.     As the Director of IDI Benefits, Defendant's job duties included, but were not

limited to, "managing a team of employees that are responsible for quality management of

complex IDI claims for an assigned block of customers," "achieving a high level of quality and

customer satisfaction," "attracting, developing, and retaining professional claims resources,"
"be[ing] involved in daily activities and decisions associated with claims," "ensur[ing] all
appropriate actions are taken and all information is received on claims before a decision is
made," and "participate in development of regional specific business plans." See Director, IDI
Benefits Job Description, attached hereto as Exhibit D.

      21.     Accordingly, as the Director of IDI Benefits, Defendant had access to (a)
Confidential Customer Information; (b) Unum's Trade Secret Information; and (c) confidential
information of Unum's employees ("Confidential Employee Information").

      22.     On August 29, 2016, Defendant attested to his receipt of the Code of Conduct,
which contains policies regarding confidentiality and security as described above.

      23.     On April 6, 2016, Defendant attended the 2016 Privacy & Information Security
Training.

**D.**      **Defendant's Wrongful Conduct**

      24.     On Wednesday, September 21, 2016, Defendant was interviewed by Unum's
inside counsel as part of an internal investigation into claims practices.

      25.     Defendant was informed and understood that if he "provide[d] incomplete or
untruthful information during [the] interview, [he] will be subject to disciplinary action,
including termination from employment." See Upjohn Warning, attached hereto as Exhibit E.

      **i.**      **Sunday, September 25, 2016**

      26.     On Sunday, September 25, 2016 – which is not Defendant's usual workday –
Defendant went to Unum's Worcester Office ("Unum's Office") and entered the building at
12:40 p.m. with, what appeared in the security video to be, an empty box. See Exhibit F.

27.     Nine minutes later, Defendant left Unum's Office with a full box and brought the box to his car. See Exhibit G.

28.     Empty handed, Defendant then re-entered Unum's Office at 12:52 p.m. See Exhibit H.

29.     Over one hour later, at 2:09 p.m., Defendant left Unum's Office with a *second* full box of documents, as well as a full briefcase, and brought the box and briefcase to his car. See Exhibit I. Defendant did not re-enter Unum's Office.

30.     Defendant had no legitimate business reason to remove at least two boxes of documents from Unum's Office on Sunday, September 25, 2016.

### ii.     Tuesday, September 27, 2016

31.     On Tuesday, September 27, 2016, Defendant worked at Unum, arriving at 9:53 a.m. and leaving sometime after 3:44 p.m. After leaving for the day, Defendant returned to Unum's Office at approximately 7:45 p.m.

32.     Approximately one hour later, Defendant left Unum's Office with a shopping bag full of documents and a full briefcase. See Exhibit J.

33.     Defendant had no legitimate business reason to remove a shopping bag full of documents from Unum's Office at night on Tuesday, September 27, 2016.

### iii.    Thursday, September 29, 2016

34.     On Thursday, September 29, 2016, Charlie Wade, Assistant Vice President of Corporate Investigations, spoke with Defendant via telephone at approximately 10:00 a.m. as part of Mr. Wade's investigation into Defendant's removal of documents on Sunday, September 25 and Tuesday, September 27, 2016 from Unum's Office.

35.     After Defendant was asked if he had printed documents on Sunday, September 25, 2016 and/or Tuesday, September 27, 2016, he refused to answer questions or participate in Mr. Wade's investigation regarding what Defendant removed from Unum's Office.

36.     At 11:14 a.m. on September 29, 2016, Defendant left Unum's Office with the laptop provided to him by Unum ("Unum's Laptop") for business, as well as a shopping bag, which appeared to be full.  See Exhibit K.

37.     Defendant had no legitimate business reason to take Unum's Laptop out of Unum's Office on Thursday, September 29, 2016.

38.     At approximately 12:00 p.m., Janine Hughes Goldberg, a Senior Employee Relations Consultant, and Holly Hayes, Assistant Vice President Employee Relations, called Defendant and asked him to return Unum's Laptop. Defendant agreed to do so.

39.     As described above, on September 21, 27, and 29, 2016, Defendant removed two boxes and two shopping bags of documents from Unum's Office, as well as documents contained in his briefcase which he removed from Unum's Office on the three occasions described above (collectively, "Unum's Documents").

40.     It is highly likely that Unum's Documents contain Confidential Customer Information, Confidential Employee Information, and/or Trade Secret Information.

**E.     Defendant's Refusal to Return Unum's Property**

41.     Despite informing Ms. Goldberg and Ms. Hayes that he would return Unum's Laptop on September 29, 2016, Defendant failed to do so.

42.     At approximately 3:00 p.m. on September 29, 2016, Defendant's then-attorney, Keith Higgins, called Unum and spoke with Ellen Donovan McCann, Assistant Vice President

and Senior Counsel of Unum's Law Department.  Attorney Higgins represented to Attorney McCann that Defendant would return Unum's Laptop by the end of the day.

43.     Defendant did not return Unum's Laptop to Unum on September 29, 2016.

44.     On October 4, 2016, Attorney McCann wrote to Attorney Higgins to again demand the return of Unum's Laptop and Unum's Documents.  See Exhibit L.

45.     On October 5, 2016, Defendant's new attorney, Roy Bourgeois, emailed Attorney McCann a letter, in which he stated that he had taken custody of "certain items and a computer in the custody of [Defendant]," and indicated that he would not return the "items" and Unum's Laptop unless they were held in escrow and Unum provided him with copy of the Upjohn warning signed by Defendant.  See Exhibit M.

46.     On October 7, 2016, Unum's outside counsel, Jonathan Sigel, responded to Attorney Bourgeois and demanded the return of Unum's Laptop and Unum's Documents by October 12, 2016, together with a signed representation that Defendant and his counsel had not retained or destroyed any copies of Unum's Documents or data contained on Unum's Laptop.  See Exhibit N.  With his letter, Attorney Sigel provided Defendant a copy of the Upjohn warning signed by Defendant.  Id.

47.     On October 12, 2016, Attorney Bourgeois wrote to Attorney Sigel, stating that Defendant "simply" would not return Unum's Laptop or Unum's Documents because Unum did not provide an assurance that its own laptop, files, and documents would be safeguarded.  See Exhibit O.

48.     On October 14, 2016, Attorney Sigel expressly stated that Mirick O'Connell would maintain Unum's Laptop and Unum's Documents "in its custody and not destroy or alter them in any way pending the resolution of this matter."  See Exhibit P.  Since Unum provided

the requested assurance, Attorney Sigel demanded the immediate return of Unum's Laptop and Unum's Documents taken by Defendant.

49.     On October 18, 2016, Attorney Bourgeois wrote to Attorney Sigel and, despite receiving Unum's assurance, refused to return Unum's Laptop unless Unum executed an Agreement, which required Unum to "negotiate in good faith" *with Defendant* "a protocol for electronic access to, and duplication of, the information stored on" Unum's Laptop and provided that Unum's Laptop would be "equally available" to Defendant. See Exhibit Q. With respect to Unum's Documents, Attorney Bourgeois stated that they would be "dealt with" by copying and bates stamping them, at some point. Id.

50.     On Friday, October 21, 2016, Unum's outside counsel, Amanda Marie Baer, spoke with Attorney Bourgeois and stated that she would sign the Agreement for the return of Unum's Laptop. With respect to the documents, Attorney Baer explained, over the phone and in an email, that Unum has responsibilities under Massachusetts law to safeguard its documents and files that contain personal information regarding Massachusetts residents. Exhibit Q. Attorney Baer stated that Defendant exceeded his authority with respect to Unum's Documents when he removed them from Unum's Office and then refused to return them to Unum despite repeated demands to do so. Id. Attorney Baer demanded the immediate return of Unum's Documents so that she could review them to determine if any redactions of Confidential Customer Information, Confidential Employee Information, and/or Trade Secret Information needed to be made. Id.

51.     Defendant's counsel responded by stating that he did not trust Attorney Baer to make a complete copy of Unum's Documents.

52.     On Monday, October 24, 2016, Attorney Baer took custody of Unum's Laptop.

53.    On Monday, October 24, 2016, Attorney Baer again demanded the immediate

return of Unum's Documents, and offered for Defendant's counsel to *watch* while Unum's

Documents were copied so that Defendant could be assured that a complete copy was made.  See

Exhibit S.

54.    Defendant's counsel responded to Attorney Baer's email and explained that –

despite Attorney Baer's explicit instructions otherwise – he was making copies of Unum's

Documents.  Exhibit T.

**F.    Unum's Duty to Report**

55.    Pursuant to M.G.L. c. 93H, § 3, Unum has a duty to provide notice when personal

information of a resident of Massachusetts has been acquired or used by an unauthorized person

or used for an authorized purpose.

56.    Unum's Documents taken by Defendant likely contain personal information of

residents of Massachusetts, including Unum's customers and/or Unum's employees and, if so,

Unum may be required to provide notice as required by law.

57.    Defendant's failure and refusal to return Unum's Documents prevent Unum from

(a) evaluating whether notice under M.G.L. c. 93H, § 3 is required; and (b) if so, providing

notice to Massachusetts residents and/or the Massachusetts Attorney General.

<u>Causes of Action</u>

**Count I**
**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act of 2016**

58.    Unum re-alleges and incorporates by reference all preceding paragraphs as if fully

alleged herein.

59.    While employed by Unum, Defendant obtained access to Unum's Trade Secret

Information.

60. The Trade Secret Information obtained by Defendant is related to Unum's services that are offered and provided in interstate commerce.

61. The Trade Secret Information obtained by Defendant is a "trade secret" under 18 U.S.C. § 1839(3).

62. Defendant has maliciously and willfully misappropriated Unum's Documents, which contain Unum's Trade Secret Information.

63. Unum has demanded the return of its property and Trade Secret Information, and Defendant has failed and refused to return that property without any appropriate basis to do so.

64. As a result of Defendant's misappropriation of Unum's Trade Secret Information, Defendant has violated the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b)(1)).

65. As a direct and proximate result of Defendant's violation of the Defend Trade Secrets Act of 2016, Unum has sustained substantial damages in an amount that will be established at trial of this matter.

66. Defendant's actions in converting and misappropriating Unum's Trade Secret Information for his own gain was willful, wanton, and malicious, and was taken with reckless disregard for the rights of Unum.

67. Defendant's actions have caused and will continue to cause Unum irreparable harm if not preliminarily and permanently enjoined.

68. Unum has no adequate remedy at law.

### Count II
### Misappropriation of Trade Secrets Under the Massachusetts Trade Secrets Act

69. Unum re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

70.     While employed by Unum, Defendant obtained access to Unum's Trade Secret Information.

71.     Unum took reasonable steps to preserve the secrecy of its Trade Secret Information.

72.     Unum's Trade Secret Information is a "trade secret" under M.G.L. c. 93, § 42 (the "Massachusetts Trade Secrets Act") and M.G.L. c. 266, § 30.

73.     Defendant has misappropriated Unum's Documents, which contain Unum's Trade Secret Information, for his own benefit.

74.     Defendant has copied Unum's Trade Secret Information.

75.     As a result of Defendant's misappropriation of Unum's Trade Secret Information, Defendant has violated the Massachusetts Trade Secrets Act.

76.     As a direct and proximate result of Defendant's violation of the Massachusetts Trade Secrets Act, Unum has sustained substantial damages in an amount that will be established at trial of this matter.

77.     Defendant's actions in converting and misappropriating Unum's Trade Secret Information for his own gain was willful, wanton, and malicious, and was taken with reckless disregard for the rights of Unum.

78.     Defendant's actions have caused and will continue to cause Unum irreparable harm if not preliminarily and permanently enjoined.

79.     Unum has no adequate remedy at law.

### Count III
### Conversion

80.     Unum re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

81.    Defendant is in wrongful possession of Unum's Documents, which likely contain Unum's Trade Secret Information, Confidential Customer Information, and/or Confidential Employee Information.

82.    Defendant has wrongfully asserted dominion or control over Unum's property in a manner inconsistent with Unum's ownership and entitlement to such property.

83.    As a direct and proximate result of Defendant's conversion of Unum's property, Unum has suffered or will suffer damages.

**WHEREFORE**, Unum respectfully requests that this Court:

1.    Order Defendant and his attorney to deliver Unum's Documents as well as any other Confidential Customer Information, Trade Secret Information and/or Confidential Employee Information in Defendant's and/or his attorney's possession, custody, and control to the undersigned counsel within twenty-four (24) hours, together with a signed representation that he, and his attorney, did not alter, destroy, remove, copy, or retain any document, file, or information;

2.    Order Defendant and his attorney to destroy any and all copies of Unum's Documents;

3.    Enter a judgment declaring that Defendant misappropriated and converted Unum's property and Trade Secret Information;

4.    Award monetary damages to Unum in an amount to be proven at trial; and

5.    Grant Unum such other relief as the Court deems just and equitable.

Respectfully submitted,

UNUM GROUP,

By its attorneys,


/s/ Amanda Marie Baer

Jonathan R. Sigel, BBO # 559850
Amanda Marie Baer, BBO #681386
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581
Phone: (508) 860-1474
Fax:    (508) 983-6261
jsigel@mirickoconnell.com
abaer@mirickoconnell.com

Dated: October 25, 2016

# EXHIBIT E

## Upjohn Warning

I am an attorney for Unum. I represent only Unum, and do not represent you personally.

I am conducting this interview to gather facts pursuant to an investigation that I am conducting for and on behalf of Unum. This interview may be used by Unum to obtain legal advice and determine whether appropriate legal actions must be taken. This interview is part of an investigation to determine the facts and circumstances relating to the following:

- Improperly coding claim closures to achieve performance metrics and/or plan forecast;
- Paying benefits on an under a reservation of rights (ROR) or on an "exceptional basis to be of service to the claimant" to achieve "paid recovery" performance metrics;
- Paying benefits without disability or eligibility being fully evaluated;
- Paying benefits prior to obtaining appropriate medical confirmation confirming disability determination.

You should not assume that any statements you make to me during this interview are protected by the attorney-client privilege. However, to the extent the attorney-client privilege is deemed to apply to this interview, the privilege belongs solely to Unum and not to you. That means that Unum may elect to waive the attorney-client privilege and reveal the substance of this interview to third parties. Unum may decide to disclose what we discuss during this interview to federal or state agencies without notifying you.

All information discussed during this interview should be kept confidential. You should not disclose the substance of this interview to anyone, including other employees, former employees, or anyone else. We communicate these expectations to employees during investigations because Unum has a compelling interest in protecting the integrity of its investigations. Please understand, however, that our request for you to maintain confidentiality does not prohibit you from speaking with external governmental agencies.

Unum's has an anti-retaliation policy. However, if you provide incomplete or untruthful information during this interview, you will be subject to disciplinary action, including termination from employment.

By signing below, I acknowledge that the warnings above have been explained to me, I fully understand these warnings, I have no questions regarding any of these warnings, and I am willing to proceed with this interview.

Signature of Employee _____        Counsel for Unum _____

Employee Name: Timothy P. Loftus
Date: 9/21/2016

COPY

DEC 2 0 2017

MICHAEL K. JEANES, CLERK
E. FLORES
DEPUTY CLERK

1

**SURRANO LAW OFFICES**
Attorneys at Law

2

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone: (602) 264-1077
Fax: (602) 264-2213

3

4

5    Charles J. Surrano III (007732) cjs@surranolawfirm.com
John N. Wilborn (013714) jnw@surranolawfirm.com

6    AZTurboCourt e-service distribution: surranolaw@gmail.com
Attorneys for Plaintiff

7

8

9    **CAMPBELL, YOST, CLARE & NORELL, P.C.**
3101 N. Central Ave., Suite 1200
Phoenix, AZ 85012
Phone: (602) 322-1600
Fax: (602) 322-1604

10

11

12   Stephen C. Yost (State Bar No. 011149) syost@cycn-phx.com
Co-Counsel for Plaintiff

13

14              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15                   **IN AND FOR THE COUNTY OF MARICOPA**

16

Dawn J. McGinnis, M.D., an Arizona
17   Resident,

Case No.: CV 2 0 1 7 - 0 1 4 7 3 5

18
                    Plaintiff,
19                                              **CERTIFICATE REGARDING**
                                                **COMPULSORY ARBITRATION**
20        vs.

21   The Paul Revere Life Insurance Company,
a foreign insurer, and Unum Group
22   Corporation, a foreign corporation,

23        Defendants.

24
          The undersigned certifies that the largest award sought by the Complaint,
25
including punitive damages, but excluding interest, attorneys' fees, and costs <u>does</u>
26

1

1   exceed the limits set by local Rule for compulsory arbitration.  This case is not subject

2   to the Uniform Rules of Procedure for Arbitration.

3       DATED this _20th_ day of December, 2017.

4                                       SURRANO LAW OFFICES

5

6                               By: _____

7                                       Charles J. Surrano, III
                                        John N. Wilborn
8                                       Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



COPY

DEC 2 0 2017

MICHAEL K. JEANES, CLERK
E. FLORES
DEPUTY CLERK

1

**SURRANO LAW OFFICES**
Attorneys at Law

2

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone: (602) 264-1077
Fax: (602) 264-2213

3

4

5

Charles J. Surrano III (007732) cjs@surranolawfirm.com
John N. Wilborn (013714) jnw@surranolawfirm.com
AZTurboCourt e-service distribution: surranolaw@gmail.com
Attorneys for Plaintiff

6

7

8

9

**CAMPBELL, YOST, CLARE & NORELL, P.C.**
3101 N. Central Ave., Suite 1200
Phoenix, AZ 85012
Phone: (602) 322-1600
Fax: (602) 322-1604

10

11

12

Stephen C. Yost (State Bar No. 011149) syost@cycn-phx.com
Co-Counsel for Plaintiff

13

14

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15

**IN AND FOR THE COUNTY OF MARICOPA**

16

Dawn J. McGinnis, M.D., an Arizona
Resident,

Case No.: CV2017-014735

17

18

Plaintiff,

**REQUEST FOR TRIAL BY JURY**

19

20

vs.

21

The Paul Revere Life Insurance Company,
a foreign insurer, and Unum Group
Corporation, a foreign corporation,

22

23

Defendants.

24

25

Pursuant to Rule 38(b), Arizona Rules of Civil Procedure, demand is hereby made for trial by jury of all issues in the above-entitled action.

26

1

1    DATED this _20th_ day of December, 2017.

2                                 SURRANO LAW OFFICES

3

4                        By: _____

5                              Charles J. Surrano, III
                               John N. Wilborn
6                              Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                                 2

1

**SURRANO LAW OFFICES**
Attorneys at Law

2

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone:  (602) 264-1077
Fax:  (602) 264-2213

3

4

5

Charles J. Surrano III (007732) cjs@surranolawfirm.com
John N. Wilborn (013714) jnw@surranolawfirm.com
AZTurboCourt e-service distribution: surranolaw@gmail.com
Attorneys for Plaintiff

6

7

8

9

**CAMPBELL, YOST, CLARE & NORELL, P.C.**
3101 N. Central Ave., Suite 1200
Phoenix, AZ  85012
Phone:  (602) 322-1600
Fax:  (602) 322-1604

10

11

12

Stephen C. Yost (State Bar No. 011149) syost@cycn-phx.com
Co-Counsel for Plaintiff

13

14

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15

**IN AND FOR THE COUNTY OF MARICOPA**

16

17

Dawn J. McGinnis, M.D., an Arizona
Resident,

Case No.:  CV2017-014735

18

Plaintiff,

**SUMMONS**

19

20

vs.

If you would like legal advice from a lawyer,
Contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

21

The Paul Revere Life Insurance Company,
a foreign insurer, and Unum Group
Corporation, a foreign corporation,

22

23

Defendants.

24

TO:   **UNUM GROUP CORPORATION**

25

26

1

1         YOU ARE HEREBY SUMMONED and required to serve upon the Plaintiff's

2   attorneys, an Answer to the Complaint which is herewith served upon you, within 20

3   days, exclusive of the date of service, after service of this Summons upon you, if served

4   within the State of Arizona, and within 30 days, exclusive of the day of service, if

5   served without the State of Arizona.  If you fail to do so, judgment by default will be

6   taken against you for the relief demanded in the Complaint.  Ariz. R. Civ. P. 4,5, 10(d).

7

8         The name and address of the Plaintiff's attorneys are:

9              Charles J. Surrano III
           John N. Wilborn

10             Surrano Law Offices
           7114 East Stetson Drive, Suite 300

11             Scottsdale, Arizona 85251

12             602.264.1077
           602.264.2213 facsimile

13

14        SIGNED AND SEALED this date: _____

15                  MICHAEL K. JEANES

16                  CLERK OF THE COURT

17                  COPY

18                  By: _____
                Deputy Clerk



19                  MICHAEL K. JEANES, CLERK
                E. FLORES
                DEPUTY CLERK

20

21

22

23

24

25

26

ORIGINAL   DEC 2 6 2017   FILED 3:51 pm

MICHAEL K. JEANES, Clerk

By _K. Newman_

Deputy

1

**SURRANO LAW OFFICES**
Attorneys at Law

2

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone: (602) 264-1077
Fax: (602) 264-2213

3

4

5

Charles J. Surrano III (007732) cjs@surranolawfirm.com
John N. Wilborn (013714) jnw@surranolawfirm.com
AZTurboCourt e-service distribution: surranolaw@gmail.com
Attorneys for Plaintiff

6

7

8

9

**CAMPBELL, YOST, CLARE & NORELL, P.C.**
3101 N. Central Ave., Suite 1200
Phoenix, AZ 85012
Phone: (602) 322-1600
Fax: (602) 322-1604

10

11

12

Stephen C. Yost (State Bar No. 011149) syost@cycn-phx.com
Co-Counsel for Plaintiff

13

14

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15

**IN AND FOR THE COUNTY OF MARICOPA**

16

17

Dawn J. McGinnis, M.D., an Arizona
Resident,

Case No.: CV2017-014735

18

Plaintiff,

**SUMMONS**

19

vs.

20

The Paul Revere Life Insurance Company,
a foreign insurer, and Unum Group
Corporation, a foreign corporation,

21

22

23

Defendants.

If you would like legal advice from a lawyer,
Contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

24

**TO:   THE PAUL REVERE LIFE INSURANCE COMPANY**

25

26

1

1         YOU ARE HEREBY SUMMONED and required to serve upon the Plaintiff's

2    attorneys, an Answer to the Complaint which is herewith served upon you, within 20

3    days, exclusive of the date of service, after service of this Summons upon you, if served

4    within the State of Arizona, and within 30 days, exclusive of the day of service, if

5    served without the State of Arizona.  If you fail to do so, judgment by default will be

6    taken against you for the relief demanded in the Complaint.  Ariz. R. Civ. P. 4,5, 10(d).

7

8         The name and address of the Plaintiff's attorneys are:

9           Charles J. Surrano III
            John N. Wilborn

10          Surrano Law Offices
            7114 East Stetson Drive, Suite 300

11          Scottsdale, Arizona 85251

12          602.264.1077
            602.264.2213 facsimile

13                     DEC 20 2017

14        SIGNED AND SEALED this date: _____

15                MICHAEL K. JEANES
                  CLERK OF THE COURT

16

17                By:_____

18                Deputy Clerk

19

20                   E. Flores

21

22

23

24

25

26

ORIGINAL

1

**SURRANO LAW OFFICES**
Attorneys at Law

2

DEC 2 6 2017   FILED 9:43am

7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Phone: (602) 264-1077
Fax: (602) 264-2213

MICHAEL K. JEANES, CLERK

3

By W. Stevens
W. Stevens, Deputy

4

5   Charles J. Surrano III (007732) cjs@surranolawfirm.com

6   John N. Wilborn (013714) jnw@surranolawfirm.com
AZTurboCourt e-service distribution: surranolaw@gmail.com

7   Attorneys for Plaintiff

8

9   **CAMPBELL, YOST, CLARE & NORELL, P.C.**
3101 N. Central Ave., Suite 1200

10   Phoenix, AZ 85012
Phone: (602) 322-1600

11   Fax: (602) 322-1604

12   Stephen C. Yost (State Bar No. 011149) syost@cycn-phx.com
Co-Counsel for Plaintiff

13

14   **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15   **IN AND FOR THE COUNTY OF MARICOPA**

16

17   Dawn J. McGinnis, M.D., an Arizona
Resident,

Case No.:   CV2017-014735

18

Plaintiff,

**SUMMONS**

19

20   vs.

If you would like legal advice from a lawyer,
Contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

21   The Paul Revere Life Insurance Company,
a foreign insurer, and Unum Group

22   Corporation, a foreign corporation,

23   Defendants.

24

25   **TO:   UNUM GROUP CORPORATION**

26

1

1        YOU ARE HEREBY SUMMONED and required to serve upon the Plaintiff's

2   attorneys, an Answer to the Complaint which is herewith served upon you, within 20

3   days, exclusive of the date of service, after service of this Summons upon you, if served

4   within the State of Arizona, and within 30 days, exclusive of the day of service, if

5   served without the State of Arizona.  If you fail to do so, judgment by default will be

6   taken against you for the relief demanded in the Complaint.  Ariz. R. Civ. P. 4,5, 10(d).

7

8        The name and address of the Plaintiff's attorneys are:

9          Charles J. Surrano III
       John N. Wilborn

10         Surrano Law Offices
       7114 East Stetson Drive, Suite 300

11         Scottsdale, Arizona 85251

12         602.264.1077
       602.264.2213 facsimile

13                        DEC 2 0 2017

14  SIGNED AND SEALED this date: _____

15

16                            MICHAEL K. JEANES
                          CLERK OF THE COURT

17  

18                            By: _____
                          Deputy Clerk

19                                      E. Flores

20

21

22

23

24

25

26

DL Investigations & Attorney Support LLC
7501 N. 16th Street, Suite 200
Phoenix, AZ 85020
(602) 285-9901

DEC 26 2017   FILED 3:51pm

MICHAEL K. JEANES, Clerk
By K. _____
Deputy

Inv. #
121717

**SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

**DAWN J. McGINNIS, M.D.**

Plaintiff / Petitioner,

vs.

**THE PAUL REVERE LIFE INSURANCE COMPANY; et al.**

Defendant / Respondent.

ORIGINAL

NO.   CV2017-014735

CERTIFICATE OF SERVICE

<u>Geoffrey Roberts</u>                    , the undersigned certifies under penalty of perjury:  That I am fully qualified pursuant to RCP 4 (d), 4 (e), 45 (b) and/or ARS 13-4072, to serve process in this case, and received for service the following documents in this action:

**SUMMONS & COMPLAINT, CERTIFICATE OF ARBITRATION, REQUEST FOR TRIAL BY JURY**

from _____ **Charles J. Surrano, III c/o Surrano Law Offices** _____ on _____ **12/21/17** _____ ;
that I personally served copies of these documents on those named below in the manner and time and place shown; and except where noted, all services were made in Maricopa County, Arizona.

**NAME:**   **THE PAUL REVERE LIFE INSURANCE COMPANY, c/o Arizona Department of Insurance**

**DATE & TIME:**   12/12/17 2:08pm
**PLACE &**   2910 N. 44TH STREET  STE.210  PHOENIX, AZ 85018, which is his/her place of business.
**MANNER:**   By serving Elizabeth Villalino, Administrative Assistant III, a person authorized to accept such service on their behalf, in person.

$15.00 service fee tendered. Description of the Named: Female, Age: 30's, Ht: 5' 9in., Wt: 140, Eyes: brown, Hair: black, Ethnicity: Hisp.

**Statement of Costs**

| | |
|---|---|
| Services | $16.00 |
| Mileage | $24.00 |
| Sp. Handl. | |
| Witness | |
| Advances | |
| Cert. Prep | $10.00 |
| Other | |
| **Total** | **$50.00** |

Affiant - Registered in
Maricopa County

The above is covered by A.R.S. as amended 41-314 & 11-45 and Rules 4, 5 and 45.

DL Investigations & Attorney Support LLC
7501 N. 16th Street, Suite 200
Phoenix, AZ 85020
(602) 285-9901

Inv. #
121718

**SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

DAWN J. McGINNIS, M.D.

DEC 2 6 2017   FILED 9.43am
MICHAEL K. JEANES, CLERK
By W. Stevens
W. Stevens, Deputy

Plaintiff / Petitioner,

vs.

**THE PAUL REVERE LIFE INSURANCE COMPANY; et al.**

Defendant / Respondent.

NO.   CV2017-014735

CERTIFICATE OF SERVICE

Tina Nemeth                          , the undersigned certifies under penalty of perjury: That I am fully qualified pursuant
to RCP 4 (d), 4 (e), 45 (b) and/or ARS 13-4072, to serve process in this case, and received for service the following documents in this
action:
**SUMMONS & COMPLAINT, CERTIFICATE OF ARBITRATION, REQUEST FOR TRIAL BY JURY**

from          Charles J. Surrano, III c/o Surrano Law Offices          on          12/21/17          ;
that I personally served copies of these documents on those named below in the manner and time and place shown; and except where
noted, all services were made in Maricopa County, Arizona.

NAME:   **UNUM GROUP CORPORATION, c/o Corporation Service Company**

DATE & TIME:   12/21/17 10:10am
PLACE &   2338 W. ROYAL PALM ROAD  STE.J  PHOENIX, AZ 85021, which is his/her place of business.
MANNER:   By serving Josef Patawaran, Service of Process Coordinator, a person authorized to accept such service on their
behalf, in person.

Description of the Named: Male, Age: 20's, Ht: 5' 6in., Wt: 150, Eyes: brown, Hair: brown, Ethnicity: Asian

**Affiant - Registered in**
**Maricopa County**

ORIGINAL

| Statement of Costs | |
|---|---|
| Services | $16.00 |
| Mileage | $26.40 |
| Sp. Handl. | $24.00 |
| Witness Advances | |
| Cert. Prep | $10.00 |
| Other | |
| **Total** | **$76.40** |

The above is covered by A.R.S. as amended 41-314 & 11-45 and Rules 4, 5 and 45.

DL Investigations & Attorney Support LLC
7501 N. 16th Street, Suite 200
Phoenix, AZ 85020
(602) 285-9901

MICHAEL K. JEANES, CLERK
BY
*Ellisha Flores*
E FLORES, FILED

Inv. #
121717

**SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

17 DEC 27  PM 3: 59

**DAWN J. McGINNIS, M.D.**

Plaintiff / Petitioner,

vs.

**THE PAUL REVERE LIFE INSURANCE COMPANY; et al.**

Defendant / Respondent.

**ORIGINAL**

NO.  CV2017-014735
AMENDED CERTIFICATE OF SERVICE

<u>Geoffrey Roberts</u>, the undersigned certifies under penalty of perjury:  That I am fully qualified pursuant to RCP 4 (d), 4 (e), 45 (b) and/or ARS 13-4072, to serve process in this case, and received for service the following documents in this action:

**SUMMONS & COMPLAINT, CERTIFICATE OF ARBITRATION, REQUEST FOR TRIAL BY JURY**

from <u>Charles J. Surrano, III c/o Surrano Law Offices</u> on <u>12/21/17</u> ;
that I personally served copies of these documents on those named below in the manner and time and place shown; and except where noted, all services were made in Maricopa County, Arizona.

**NAME:**   **THE PAUL REVERE LIFE INSURANCE COMPANY, c/o Arizona Department of Insurance**

**DATE & TIME:**  12/21/17 2:08pm
**PLACE &**   2910 N. 44TH STREET  STE.210  PHOENIX, AZ 85018, which is his/her place of business.
**MANNER:**   By serving Elizabeth Villalino, Administrative Assistant III, a person authorized to accept such service on their behalf, in person.

$15.00 service fee tendered. Description of the Named: Female, Age: 30's, Ht: 5' 9in., Wt: 140, Eyes: brown, Hair: black, Ethnicity: Hisp.  This is an amended certificate of service to correct the service date.

**Statement of Costs**

| | |
|---|---|
| Services | $16.00 |
| Mileage | $24.00 |
| Sp. Handl. | |
| Witness | |
| Advances | |
| Cert. Prep | $10.00 |
| Other | |
| **Total** | **$50.00** |

Affiant Registered in
Maricopa County

The above is covered by A.R.S. as amended 41-314 & 11-45 and Rules 4, 5 and 45.